HAWKINS CONSTRUCTION COMPANY, A CORPORATION, APPELLEE, v. MATTHEWS COMPANY, INC., A CORPORATION, ET AL., APPELLANTS.

209 N. W. 2d 643

Filed July 27, 1973. No. 38627.

Crossman, Barton & Norris and John R. Douglas of Cassem, Tierney, Adams & Henatsch, for appellants.

Knudsen, Berkheimer, Endacott & Beam, for appellee.

Heard before WHITE, C. J., BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ., and HASTINGS, District Judge.

WHITE, C. J.

This is an action for property damage sustained by plaintiff Hawkins Construction Company as a result of the collapse of a scaffold manufactured by the defendant Waco Scaffold and Shoring Company and leased to the plaintiff by the defendant Matthews Company, Inc. The jury returned a verdict for the plaintiff and against both defendants in the amount of $32,635.48. We affirm the judgment of the District Court.

Because of the complex nature of this case, a careful review of the facts is necessary. In May of 1968, the plaintiff Hawkins Construction Company entered into a contract with Swift and Company of Chicago under the terms of which plaintiff was to construct a ham canning facility for Swift at 94th and J Streets in Omaha, Nebraska. A substantial amount of scaffolding equipment was needed for the job, and the plaintiff made an investigation as to availability, cost, and similar factors. Because of the frequent need which companies like the plaintiff have for scaffolding equipment, manufacturers and suppliers periodically send it advertising brochures, and the plaintiff had a complete set of the latest brochures

in its office. Among the pamphlets was one published by the defendant Waco, which the plaintiff had received from Mr. William Matthews of the defendant Matthews Company, Inc. The back cover was rubber-stamped with one of the Matthews Company's trade names, "Scaffold Rental & Sales Co.," together with its address and phone number.

The Waco pamphlet described the various types of scaffold components manufactured by the company, and provided pictorial representations of suggested applications of the equipment. In addition, the pamphlet contained the following statement: "Waco HI-LOAD shoring equipment is designed to safely carry working loads up to 20,000 pounds per panel. This is twice the load capacity of conventional steel scaffolding." The pamphlet later reiterated the claim in the following manner: "HI-LOAD panels will safely carry individual concentric loads up to 10,000 pounds per leg as illustrated. These loads were established following test procedures recommended by the Steel Scaffolding and Shoring Institute." Accompanying this text was a drawing of a scaffold panel with the number "10,000" above each of its two legs.

Thomas Lang, plaintiff's job sponsor on the Swift project, testified that he relied on statements made in the brochure in entering the lease arrangement for Waco equipment with the defendant Matthews Company. Fred Hawkins, president and majority stockholder of the plaintiff, testified at trial that he also relied on the brochure in helping to make the decision to use Waco scaffolding, but in a deposition prior to the trial he had testified that there was "no particular thing" he read or saw that influenced his thinking, and that price was an important factor as well.

In any case, the decision was made to use Waco scaffolding, and to lease it from the defendant Matthews Company. Lang, the job sponsor, went to William Matthews, described the project and the purposes for which

the equipment was to be used, and provided him with blueprints of the job. In time, the plaintiff received back from Matthews a series of drawings prepared by Waco showing the recommended scaffolding configuration for the plant's construction, and work on the project began.

The purpose of the scaffolding involved in the collapse was the support of the roof deck cement pour. The plaintiff's men first consulted soil compact tests made by a local laboratory in an effort to determine whether the foundation upon which the scaffold would be erected was firm. Under the supervision of Thomas Flynn, the plaintiff's carpenter foreman, "mud sills" were then placed on the ground to support the structure. These sills consisted of 2 x 12 inch boards laid flat on the ground, and their purpose was to prevent sinkage by distributing the weight of the scaffold and its load more evenly over the base soil. Screw jack base plates, permitting vertical adjustment of the panels, were then nailed to the mud sills, and levels were taken at each stage of this assembly to insure that the base scaffold structure was perfectly horizontal. The tubular frame panels forming the bottom section of the structure were then fitted into the base plates.

The roof deck construction required the scaffolding to reach to a height of 20 feet and, since each scaffold panel is only 6 feet high, the job thus required panels to be stacked on top of each other until the desired height was reached. In order to accomplish this, the plaintiff had ordered tubular connectors, manufactured by the defendant Waco, from the defendant Matthews Company. These connectors are merely hollow tubes with an interior diameter slightly larger than the tubular feet of a scaffold panel. Connectors are fitted over the tubular supports of the bottom panel, and the upper panel is then stacked on top by fitting its feet into the connectors.

Originally, these connectors were manufactured by

simply welding a reinforcing ring washer to the outside center of a solid length of pipe. More recently, however, the connectors have been formed by hydraulically pressing two smaller lengths of pipe together with an amount of pressure greater than their yield value, so that the two pieces deform at the center to form an exterior ridge as they join. All this is accomplished without heating the connector components, and the procedure is correspondingly known as a "cold form process." It was the latter type of connector which Matthews Company provided for the plaintiff's use on the Swift job, and the effect of the cold form process on the stability of these connectors is actively disputed.

Once the panels have been stacked to reach the desired height they are topped off with "shore heads," U-shaped holders designed to cradle some of the supportive lumber bracing which will underly the plywood pour base. More specifically, the short heads cradle the "ledgers," which consist of a minimum of three and sometimes four 2 x 12's nailed together front to back and fitted into the shore heads on edge. That is, if three 2 x 12's are used, the ledger when installed would be 6 inches wide in the shore head and would stand 12 inches above it. The ledgers, in turn, support the "joists." Joists are lengths of lumber placed on edge on top of the ledgers and at right angles to them. It is the joists which provide direct structural support to the plywood pour base above, and, in this case, they were placed 16 inches apart on center.

In the construction of these joists the plaintiff departed from the plans supplied to it. The variances involved the size of lumber used for joists and the type of structural bracing supporting them. It is undisputed that the Waco plans called for the joists to be made from 2 x 10's and that the plaintiff used 2 x 12's instead; thus the joists supporting the plywood pour base stood 12 inches off the ledgers rather than the recommended 10 inches. The plaintiff's job sponsor admitted that one of the reasons 2 x 12's were used was that they

are more versatile, and could be reused, either as joists or as ledgers, on other jobs.

The Waco plans also called for the joists to be supported by cross-bracing, and the plaintiff used horizontal bracing. Cross-bracing involves the placement of an "X" shaped set of cross beams at specified intervals between the joists; horizontal bracing consists of running lengths of 1 x 4's along the bottom edges of the joists at specified intervals and securing them to the joist edges with double head eightpenny nails. The joists themselves are then secured to the plywood pour base above with sevenpenny block nails. The ends of both the ledgers and the joists are rested against the outer wall of the plant structure in order to add stability to the form system. Cross-bracing is more expensive and time consuming to employ, but is somewhat stronger than horizontal bracing, particularly where lateral force is involved. Horizontal bracing is commonly used in the construction industry, however, and had been used by the plaintiff on many prior projects. The supportive effectiveness of the larger joists, buttressed by horizontal rather than cross-bracing, is also actively disputed.

On October 22, 1968, the plaintiff's workmen were engaged in a cement pour on a portion of the roof deck. Edward Pechar, the "pour watcher," was stationed underneath the deck to make sure the tower legs did not settle as a result of the cement being placed on the plywood pour base. This he did by tying red indicator ribbons at premarked points on the scaffold and then sighting on them with a construction level throughout the pour. He observed nothing unusual. Thomas Flynn, the carpenter foreman, had routinely checked the connectors, shore headings and footings before the pour, and he, too, had found nothing unusual. Jack Moore, the concrete superintendent, and Stan Siedlik, the labor foreman, were both up on the pour deck, and had just waved off an empty bucket which had dumped a load of wet cement onto the plywood base.

Without warning of any kind a portion of the roof deck on which the men were working suddenly gave way. Siedlik went down with the collapse to the ground and cement and debris came down on top of him, but he miraculously escaped with only minor injuries. Pechar, who had turned away from the pour temporarily, heard a loud noise and turned to see the roof collapsing less than 10 feet away. Moore was standing just beyond the area of collapse, and was not injured. All three men agreed that prior to the collapse there was no vibration, noise, or any other unusual symptom of trouble, and that the only noise accompanying the accident was the single loud report as the roof fell.

After the collapse, Lang inspected the scene and determined that the damage had taken place in a square area approximately 48 feet on a side. The ground was covered with debris, including at least a dozen broken connectors. Flynn, the carpenter foreman, testified that all the broken connectors he observed after the accident were fractured in the middle, where the deformed ring is located. The area was also strewn with splintered lumber, bent scaffolding sections, and other debris.

At the threshhold of this case is the question of causation. The plaintiff contends that the collapse was proximately caused by the failure of defectively manufactured connectors. The defendant Waco contends that the collapse was caused by insufficient bridging applied to unstable joists, permitting the joists to roll over and thus give way. As to this point, the trial involved a conflict of expert testimony.

James Hossack, a professor of civil engineering at the University of Nebraska at Omaha, was employed by the plaintiff on December 26, 1968, to investigate the collapse. After studying the plans, interviewing persons who witnessed the accident, and consulting relevant literature, Hossack proceeded to conduct experimental tests at the University in the summer and fall of 1969, with a view toward determining the cause of the

collapse. These tests were conducted under the supervision of Flynn, the carpenter foreman, Jack Folker, the job superintendent, and Thomas Lang, the job sponsor, all of whom assisted in constructing the scaffolding for the tests.

The tests were divided into two parts. The first series of experiments involved outdoor testing of various portions of the scaffold configuration. The first two tests examined the effect of lateral force on the wood shoring system, the first test involving horizontal bracing and the second involving the recommended crossbracing. In both cases the ultimate failure of the structure was slow — in the case of the horizontal bracing the joists held the load for 15 to 20 minutes before significant relaxation — and in both cases the failure was clearly audible before the collapse. When the horizontal bracing was tested, for example, the system held the simulated load up to the point where 5 inches of joist deflection was reached, and the deformation of wood and nailing could be heard after the 2-inch deflection point was reached. Hossack testified that "(w)ood systems literally groan and you can hear them quite loud under load." This is the result when the joist system rolls. It is to be contrasted with the testimony of the witnesses who said that the collapse was sudden and inaudible prior to the failure.

A third outdoor test was conducted to determine if the wood joist system would interact with the steel scaffolding system to produce a failure, and the result was that no collapse was produced, and no joists rolled, but 10 connectors were either partially or completely fractured at the center.

Indoor tests were conducted on the connectors to determine whether they contained a defective weakness. The tests were conducted on a Tinus Olson Axial Load simulator, which has the capability to apply either tension or compression forces to a given component subject. Two of the tests involved bending the connectors

until failure, and both resulted in breakage of the connector along the seam line at the center. A third test involved what Hossack called "straight tension," i.e., a pulling apart to determine whether the connector contained a weak spot. In a fourth test, in which compression force was applied, a connector withstood approximately 15,000 pounds of pressure, at which point the pin couplings attaching it to the simulator failed.

In addition, Hossack cut two connectors along the longitudinal axis in order to examine their interior structure. One of these connectors was found to be incompletely joined at the center, which Hossack attributed to insufficient pressure in the manufacturing process.

Over objection, Hossack was permitted to offer his opinion as to the cause of the collapse, based on his examination of photographs taken at the scene, his testing of the scaffolding system and its components, and the testimony of the witnesses who heard no noise prior to the sudden collapse. In his opinion the accident was not caused by a failure of the wood shoring system, but by a defect in the steel scaffolding, to wit: A plane of imperfection in the center of the connectors.

The defendants' expert was Fred C. Kosmach, the senior engineer for Waco and the designer of the scaffolding plans for the Swift job. He and the Waco Company had been notified of the collapse by Hawkins, and he flew to Omaha from the home office in Illinois the same day. Upon arriving at the site, Kosmach began an inspection of the debris and the remaining structure. He observed the deviations which the plaintiff made from his plans, and he also observed that some of the plywood which had fallen did not appear to have been nailed to the joists. He testified that an instantaneous collapse could occur if one or two joists which were not nailed down suddenly rolled. He further testified, based on his experience in testing over 100 Waco scaffolding configurations to failure, that the Swift system failed

because of the deviations from the Waco plans and a resulting rollover of joist supports. He computed the "leg load" on this job at 7,100 pounds, and testified that the Waco equipment could withstand a load of 22,500 pounds per leg before collapse if properly constructed. Furthermore, he testified that a connector has never failed in one of his tests.

The defendant Waco argues that there was insufficient evidence to submit to the jury the issue of the proximate cause of the collapse. Its argument, in effect, is that as a matter of law the proximate cause of the collapse was the failure of Hawkins to comply with the specifications of Waco in constructing the scaffold. As we have seen, in light of the nature of the expert testimony, this resolved itself into a dispute as to whether the collapse was lateral or vertical in nature, and if vertical in nature, whether the jury was clearly wrong in finding that the collapse was caused by defect in the "connectors." It resolved this conflict in favor of the plaintiff, since the instructions of the court required it to find not only a defect in the steel scaffolding system and delivered to plaintiff by Waco, but that such defect was the proximate cause of the accident. From the evidence that we have reviewed here it is obvious there was a direct conflict and there was ample evidence to support a finding that the connectors were defective, and that the defect did actually result in a breaking and a lack of support, causing the vertical collapse of the scaffolding structure. A jury verdict on such issues may not be set aside unless it is clearly wrong and it is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party and all conflicts in the evidence, expert or lay, and the credibility of the witnesses is for the jury and not the court. Hancock v. Parks, 172 Neb. 442, 110 N. W. 2d 69; Trailmobile, Inc. v. Hardesty, 173 Neb. 46, 112 N. W. 2d 535.

A strenuous attack is made upon the competency of

Hossack's testimony for the plaintiff. The defendant Waco argues that his tests were conducted improperly, that his opinion was based on assumptions and speculation, and that the hypothetical question which elicited the opinion did not fairly reflect the proven facts. This court has repeatedly held that a trial court has wide latitude in the admission of experimental tests. We have said that the difficulties attending an offer of evidence of illustrative experiments requires that in such cases a wide latitude or discretion be conferred upon the trial court and that unless there is a clear abuse of discretion a judgment will not be reversed on account of the admission or rejection of such testimony. Crecelius v. Gamble-Skogmo, Inc., 144 Neb. 394, 13 N. W. 2d 627; Ripp v. Riesland, 180 Neb. 205, 141 N. W. 2d 840. More precisely we have said that the proponent of such expert testimony based upon the experiment must demonstrate "that the person who makes the experiment is competent to do so, that the apparatus used was of the kind and in the condition suitable for the experiment, and that the experiment was honestly and fairly made." Omaha Street Ry. Co. v. Larson, 70 Neb. 591, 97 N. W. 824; Crecelius v. Gamble-Skogmo, Inc., *supra*. Most of the defendants' argument in this area appears to be an argument on the merits to the jury and not an argument as to admissibility or competency. Waco argues that Pechar, the employee charged with the observation of the scaffolding, had not observed, prior to the collapse, any bending or change of position of any of the scaffolding towers. It also argues that Hossack, the plaintiff's expert, failed adequately to explain why the connectors had not failed in the 2-month period prior to the collapse. Of course, it would be completely impossible to absolutely duplicate the actual conditions and repeat the scaffolding collapse. A review of the evidence we have given demonstrates that a jury could reasonably find Hossack had conducted an experiment that was reasonably if not almost a duplicate of the

conditions existing in this rather complex accident situation. The defendant Waco cites no authority that would support the proposition that the observer Pechar was required to testify to the element of bending in the tower. Pechar testified that his job was to watch for tower *settlement*, not bending. Hossack, plaintiff's expert, testified that the bending which occurs under this type of stress is slight — perhaps no more than $5/8$ of an inch — and thus almost invisible to the naked eye. We hold that there was no abuse of discretion by the trial judge in admitting the results of these experiments, as testified to by Hossack, into evidence.

The defendant Waco generally contends that Hossack's opinion is based on mere speculation. From what we have said it is clear that Hossack exhaustively outlined the nature and the scope of his tests, and their results. It appears that he carefully and clearly explained the reasons for his conclusions. We point out that the defendants' expert constructed a model also and conducted an experiment, all of which was admitted into evidence. But the jury accepted Hossack's and not the defendants'. The argument that the scaffold had not collapsed previously is directed toward the merits, and is insufficient to sustain an attack upon the admissibility of Hossack's expert opinion.

In an overlapping argument the defendants assail the form of the hypothetical question and particularly because it omitted the testimony of Pechar, who observed the collapse. A hypothetical question should fairly reflect the proven facts. Great latitude is allowed the trial judge in ruling on admissibility of such a question. A hypothetical question is not improper simply because it includes only a part of the facts testified to. Landis & Schick v. Watts, 84 Neb. 671, 121 N. W. 980. An expert witness in giving an opinion has a right to confine the facts that he recites to those which are believed to be true, or which are believed to be material to the issue. The question of what facts are relevant to the

determination is one of the basic ones upon which experts in any given field may differ. Again the disregarding of Pechar's lack of evidence on the bending is an argument directly on the merits to the jury in an attack upon the credibility of Hossack's testimony, and does not affect its admissibility.

We have examined the other contentions made by the defendant Matthews Company in this area and for the same reasons find them to be without merit.

We turn now to the basic question presented in the case on the substantive issues of liability. The trial court submitted the theory of strict tort liability and liability under the Uniform Commercial Code in one combined set of instructions and requiring the jury to return one verdict either in favor of the plaintiff or the defendants. No error in the combining of these two theories and causes of action in one set of instructions is asserted and does not require our attention. Since the trial court submitted and permitted the jury to return a verdict for the plaintiff on the theory that the defendants were liable for *all* property damage occurring as a result of the defective connectors, we are required to examine these instructions comprehensively to determine the proper range of strict tort liability in this jurisdiction. We last had occasion to examine in detail the controversy surrounding strict tort liability in Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601 (1971). Our extension or adoption of strict liability in that case was restricted. We laid down the broad rule that "a manufacturer is strictly liable in tort when an article he placed in the market, knowing that it is to be used without inspection for defects, proves to have a defect which causes an injury to a *human being* rightfully using that product." Id. at 436, 191 N. W. 2d at 606. (Emphasis supplied.) We are faced squarely with the proposition of the extension of a doctrine beyond personal injuries to permit recovery for all property damage.

As the plaintiff argues, logically this extension seems to be irresistible. The problem arises because the maximum logical extension of strict tort liability runs headlong into the restrictive provisions of the Uniform Commercial Code setting up the standards for liability for breach of warranty, which the trial court also submitted. It appears clear that a plaintiff would sooner rely on strict tort for his recovery than on the Uniform Commercial Code warranty rules, since the latter require more of him and less of the seller or manufacturer. For example, the plaintiff is required, under section 2-607 (3) (a), U.C.C., to give the defendant notice of breach. Furthermore, a manufacturer and a consumer either may agree or the manufacturer may disclaim any warranties under section 2-316, U.C.C., providing the disclaimer is not unconscionable within the meaning of sections 2-302 and 2-719(3), U.C.C. This conflict poses a historic debate in the development of strict tort liability. See, Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L. J. 1099 (1960); Restatement, Torts 2d, § 402A, and Comment m at p. 356 (1965).

Space does not permit an exhaustive discussion of this question. The total damage to the plaintiff in this case, for which it recovered, was $32,635.48. Included in the petition and the prayer were the costs of replacing the damaged structure, as well as the cost of replacing the scaffolding which was alleged to be defective. Consequently, it appears in this case, as it has in several of the authorities governing the situation, that to merely distinguish between personal injury and property damage losses is to analyze the problem incompletely. It is clear, in light of the Uniform Commercial Code, that the class of property damage situations may be further subdivided into two categories: Situations where the defective product causes damage to itself and situations where the defective product causes damage to other property. The plaintiff argues for the lode star rule of

the controversial case of Santor v. A & M Karagheusian, Inc., 44 N. J. 52, 207 A. 2d 305 (1965). Beyond personal injury, recovery was allowed in that case on a strict tort theory, in order "to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves." This result, as mentioned, seems inevitable, in pure logic, but the application of comprehensive strict tort liability would clearly emasculate the applicable provisions of the Uniform Commercial Code as to warranty and warranty liability which were designed to apply where the product is defective but where no damage results from the defect, either to persons or other property.

The collision between the Uniform Commercial Code and the expanding application of the doctrine of strict tort liability, is a present controversy in the law of utmost importance. We have reviewed the pertinent authorities, including the discussion and claimed ambiguity of the compromise section 402A of Restatement, Torts 2d. See, Santor v. 'A & M Karagheusian, Inc., *supra;* Price v. Gatlin, 241 Ore. 315, 405 P. 2d 502; Baum v. Murray, 23 Wash. 2d 890, 162 P. 801; LaHue v. Coca Cola Bottling, Inc., 50 Wash. 2d 645, 314 P. 2d 421; Seely v. White Motor Co., 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145; Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases, 18 Stan. L. Rev. 974; Shanker, Strict Tort Theory of Products Liability and the Uniform Commercial Code: A Comentary on Jurisprudential Eclipses, Pigeonholes and Communications Barriers, 17 W. Res. L. Rev. 5; Titus, Restatement (Second) of Torts. Section 402A and the Uniform Commercial Code, 22 Stan. L. Rev. 713.

From a review of the authorities and giving maximum import to the basic doctrine of strict tort liability, we feel that the doctrine of strict tort liability was not

conceived as a substitute for warranty liability in cases where the purchaser has only lost the benefit of his bargain. It seems to us quite apparent that it was designed to make the risk of defect-caused injuries an enterprise liability, so that the burden of injury is not placed entirely on "the unfortunate victim" who is often ill-equipped to bear it. See Greenman v. Yuba Power Products, Inc., 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d 897 (1963). If the loss is merely economic, the Uniform Commercial Code has given the purchaser an ample recourse under the particular provisions and requirements of the code. Placed broadly, it is the law of sales, and not the law of torts, which protects the buyer's interest in the benefit of his bargain.

We examine briefly the jurisprudential considerations underlying the conflict. We perceive no sound reason for extending the doctrine of strict tort liability to the point where it emasculates the law of sales and the Uniform Commercial Code, and extended to situations in which the loss involves injury to the defective product itself. The Uniform Commercial Code, adopted by our Legislature, was designed to set up standards covering the very situation present in this case concerning the defective scaffold. It balances the competing interests of the manufacturer and seller with the public policy objective of preserving the freedom of contract and the consequent acceleration of business productivity and the necessary experimentation in the development of new products. In a commercial transaction, the seller should be free to limit his liability for defects by clearly telling the purchaser what he is buying; and this the code permits him to do. The collision can be avoided and the situation reconciled by seeing clearly that public policy only demands an additional remedy be given the buyer which eliminates situations beyond the range of the Uniform Commercial Code and the applicable law of sales. Paraphrasing Justice Cardozo, we do not think it was the intent of the Legislature or proper public

policy to flay the manufacturer by punishing him for contractually limiting the risks involved as to the defective product itself. In Kohler we properly held that every purchaser has a right to be protected from *personal injury* regardless of the terms of the sale. But these jurisprudential and public policy considerations and arguments are not persuasive when losses are purely commercial, and the parties are free to contract betweeen themselves and the Uniform Commercial Code as enacted by the Legislature protects this interest and provides the remedy in case of breach.

At this point we are required, therefore, to hold that the District Court was in error in submitting the issue of strict tort liability to the jury as to the damage sustained. The jury verdict being general, this court has no way of knowing but that the jury resolved the case totally upon the issue of strict tort liability. We are faced with the proposition of the determination of whether this erroneous submission of the issue of damages from strict tort liability is prejudicial. We hold that it was not. As we shall soon see, in the discussion of the breach of warranty cause of action, the plaintiff was entitled to prevail as a matter of law on the issues presented in recovery for breach of warranty, except the issues of whether the product was defective and whether it was the proximate cause of the damage and injury. These issues being identical to both theories of recovery, the jury's verdict would necessarily have been for the plaintiff under either theory of recovery, and consequently there is no prejudicial error.

We examine briefly the defendants' contention as to error in the submission of the breach of warranty of liability. First, the defendant, Matthews Company, claims that as a mere lessor strict tort coverage should not be permitted against it for that reason. This contention has no merit. Clintrone v. Hertz Truck Leasing & Rental Service, 45 N. J. 434, 212 A. 2d 769; Martinez v. Nichols

Conveyor & Engineering Co., Inc., 243 Cal. App. 2d 795, 52 Cal. Rptr. 842.

Liability of Waco and Matthews flows from the provisions of section 2-313, U.C.C., which provides in part:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. * * *

"(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

The Waco brochure was stamped with the Matthews Company tradename, and constituted express warranties under the above provisions. The warranties were originally made by Waco and adopted by Matthews. Express warranties may be made in an advertising brochure. Brown v. Globe Laboratories, Inc., 165 Neb. 138, 84 N. W. 2d 151. A manufacturer or seller may be held liable under such an advertising warranty even though he is not in privity of contract with the purchaser. Sylvestri v. Warner & Swasey Co., Inc., 398 F. 2d 598 (2d Cir., 1968); Henningsen v. Bloomfield Motors, Inc., 32 N. J. 358, 161 A. 2d 69; Randy Knitwear, Inc. v. American Cyanamid Co., 11 N. Y. 2d 5, 226 N. Y. S. 2d 363, 181 N. E. 2d 399 (1962); cf., Burr v. Sherwin Williams Co., 42 Cal. 2d 682, 268 P. 2d 1041 (1954).

The pamphlet or advertising brochure assured the user that the equipment "is designed to safely carry working loads up to 20.000 pounds per panel" and that this figure was "established following test procedures

recommended by the Steel Scaffolding and Shoring Institute." These are statements regarding specific performance capabilities, and we hold that they constitute express warranties as a matter of law. See Greenman v. Yuba Power Products, Inc., *supra*.

The defendant Waco answers claiming that the warranties were qualified, either expressly or impliedly, by the condition in the brochure that the plaintiff comply with the specifications of the engineering plans as to lumber design, and that the plaintiff was required to demonstrate such compliance as a condition precedent to recovery. But in other language in the brochure Waco placed the final responsibility for the timber design and the placement with the user, Hawkins. This is not the statement of a manufacturer who seeks to impose an exacting and absolute condition precedent concerning lumber design on the user. It certainly gave the user leeway to change from 2 x 10's to 2 x 12's, unless such change was the proximate cause of the collapse and the damage, which issue was resolved against the defendants by the jury. Under the undisputed contents of the brochure, and the nature of the warranty, the defendants, as a matter of law, waived the absolute compliance with the conditions of timber design implied or suggested in their plans, and thus left the plaintiff free to prove that there was substantial compliance or that lack of compliance was not the proximate cause of the damage. Melcher v. Boesch Motor Co., 188 Neb. 522, 198 N. W. 2d 57.

The defendant Matthews Company argues that there was no proof of the adoption of the warranty by it. The authorities cited by Matthews are patently distinguishable. We feel that the evidence shows an adoption of Waco's warranty by Matthews as a matter of law. Matthews was the only one with whom the plaintiff dealt. It supplied the advertising brochure in an effort to induce the plaintiff to lease the Waco scaffolding from it. The warranty was adopted and presented to the plain-

tiff in an effort to gain the plaintiff as a customer, and we hold that Matthews Company, as a matter of law, is thus by its own admission bound by it.

The next issue presented in the arguments of the defendants is that these warranties did not become a part of the "basis of the bargain," within the meaning of section 2-313(1), U.C.C. It is clear that these warranties as a matter of law, became the basis of the bargain under the facts we have recited above. Comment 3 to section 2-313(1), U.C.C., states with reference to the basis of the bargain that, "no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof."

As we have already pointed out, the issue that the product was defective, that the defect existed at the time the product left the manufacturer's control, that the product reached the consumer substantially unchanged, and was the proximate cause of the damage, were issues all resolved against the defendants by the jury and we will not disturb them. These issues are, in substance, identical issues that are necessary to prove under the strict tort theory. The jury, by its verdict, found that the cold form pressing process used to manufacture the connectors resulted in a critical plane of structural weakness along their centerline, either because of defective design or because of insufficient pressure used in the manufacturing of the connectors in this particular case. There is testimony indicating that some of the connectors were already broken at the time they were delivered and that these broken connectors were sorted out and discarded before the construction project began. We repeat the evidence no further. There is ample evidence in the record to support the jury's conclusions in these fundamental aspects of the case.

Considerable discussion and argument is made by the defendants as to the submission of the issue of con-

tributory negligence. It is clear that traditional "contributory negligence" in the sense of a failure to discover a defect or to guard against it, is not a defense to a suit in strict tort, or for a breach of warranty. Assumption of risk and misuse of the product are. Restatement, Torts 2d, § 402A, Comment n, p. 356. Whatever error there was in submitting the *broader* issue of contributory negligence obviously could not be prejudicial to the defendants but only to the plaintiff. There is no merit to this contention.

It thus becomes clear, as applied to this case, that the two theories of recovery became married and that the trial court instructed accordingly. As to the crucial issues of a defect in the product and proximate cause, the jury was required to make identical findings no matter which theory of recovery was permitted. As to all other issues the plaintiff was entitled to prevail as a matter of law. Consequently there was no prejudicial error in the over-broad submission of damages on strict tort liability.

Complaint is also made concerning certain other instructions and evidentiary rulings of the trial court. We have examined these contentions and they are without merit.

The judgment of the District Court is correct and is affirmed.

AFFIRMED.

BOSLAUGH, J., concurs in the result only.

SMITH, J., concurring in the result.

Submission to the jury of both theories of liability on the evidence was not reversible error. In that respect it would be a healthy instinct for us to rest our reasons there. Important information relating to policy is inadequate. W. Page Keeton, "Products Liability - Inadequacy of Information," 48 Tex. L. Rev. 398 at 402 (1970). The theory of liability conceivably is largely a matter of judicial policy.

McCOWN, J., concurring in part and dissenting in part.

I concur in much of the discussion and in the result reached in the majority opinion. I dissent from that portion of the opinion which purports to hold that the doctrine of strict liability in tort on the seller of defective products does not extend to the property damage here involved.

In Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601, this court adopted the doctrine of strict liability in tort on the seller of defective products where personal injuries resulted. The majority opinion now refuses to extend that doctrine to physical damage to the property of the ultimate user or consumer. The basis for that determination misconceives and misinterprets the doctrine of strict product liability in tort.

Section 402A of Restatement, Torts 2d, p. 347, provides in part: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if * * *."

It will be noted that the critical difference rests on the term "physical harm" and not on any distinction between person and property. Every other section of Restatement dealing with areas of strict liability refers to liability for harm to the person, land, or chattels of another. There is no logical or reasonable basis upon which the doctrine of strict liability for defective products can be applied to physical harm caused to a person, and at the same time be denied for physical harm caused to his property.

The distinction which the majority opinion attempts to make treats the damages caused here as being "commercial" or an economic loss of the bargain. The opinion therefore concludes that it is more suitable for handling under warranty provisions and the Uniform Commercial Code. The opinion also attempts to bolster that conclusion by the fact that a fractional share of the damages claimed was for replacement of the scaf-

fold itself. Nevertheless, the entire damage was in the form of physical harm to the property of the plaintiff. There is a clear distinction between a defective condition which causes direct tortious physical harm in the form of damage to the person or property of a user, and a defective condition which causes only a commercial or economic loss resting on warranty and grounded in the U.C.C.

In Seely v. White Motor Co., 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145, Chief Justice Traynor, in refusing to apply the doctrine of strict liability to cover economic loss, set out the distinctions which the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss. He said: "The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. * * * The Restatement of Torts similarly limits strict liability to physical harm to person or property."

Following a discussion of the Uniform Commercial Code and its application to cases of commercial loss, Chief Justice Traynor said: "Plaintiff contends that, even though the law of warranty governs the economic

relations between the parties, the doctrine of strict liability in tort should be extended to govern physical injury to plaintiff's property, as well as personal injury. We agree with this contention. Physical injury to property is so akin to personal injury that there is no reason to distinguish them." He refused to apply the doctrine in that case because there was no proof in the trial court that the defect caused the physical damage to the truck involved.

In the case before us the damage was the result of "physical harm" to the plaintiff's property, which was property other than the defective product. The scaffold itself was leased by the plaintiff. While it also suffered physical harm, that fact ought not alter the situation nor impel the court into a restrictive treatment of the doctrine of strict liability. Particularly is that true here when the plaintiff clearly ought to recover under either theory, and there is no justification for the gratuitous restriction. Physical injury is not limited to personal injury and physical harm is not merely economic loss. To permit recovery in tort on the basis of strict liability when the user or consumer suffers personal injuries from an accident caused by a defective product but to deny recovery for physical injury to his property suffered in the same occurrence is a distinction inconsistent with the whole body of the law of torts.

Section 402A of Restatement, Torts 2d, p. 347, is a comprehensive and accurate statement of the law of strict tort liability on the seller of defective products. It should be adopted by this court.

CLINTON, J., concurring.

I concur in the opinion of White, C. J., but feel that the rationale for declining at this time to extend the doctrine of strict liability in tort beyond allowing recovery for personal injury should be elaborated. Three related reasons, I believe, indicate the wisdom of not extending the doctrine to property damage cases.

First: Such extension, I believe, comes into conflict

with the provisions of the Uniform Commercial Code. Where the doctrine of strict liability in tort is applicable remedies under the U.C.C. are superfluous and the U.C.C. provisions pertaining to exclusion and modification of warranties, limitation on damages, and modification and limitation of remedies are eliminated, that is, repealed by judicial fiat. §§ 2-316, 2-718, 2-719, U.C.C. On this general problem see Titus, Restatement (Second) of Torts, Section 402A and the Uniform Commercial Code, 22 Stan. L. Rev. 713.

Property damage is one of the types of damage concerning which the U.C.C. makes rules. §§ 2-715(2) (b), 2-719(3), U.C.C. Personal injuries resulting from breach of warranty are also the subject matter of regulation by the U.C.C. How then do we make a determination that damages of the one type should be compensable under the doctrine of strict liability, and damage of the other type is not compensable under that doctrine but only under the U.C.C.? Two reasons exist: (1) In personal injury cases strict liability has a foundation antecedent to and independent of the sales provisions of the U.C.C. This justifies such different treatment. The foundation rests upon the special food warranty cases. Asher v. Coca Cola Bottling Co., 172 Neb. 855, 112 N. W. 2d 252 (1961). See Titus, Maj. Op Cit., 772. In Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601, we indicated that we relied on Asher and felt that although that case was couched in warranty terms, what we were really doing in Kohler was only changing the label. The U.C.C. provides: "Unless displaced by the particular provisions of this act, the principles of law and equity . . . shall supplement its provisions." § 1-103, U.C.C. It may be argued on these grounds that the U.C.C. did not displace existing remedies so far as personal injury is concerned. This is the effect of our holding in Kohler. See Titus, Maj. Op Cit., 758, et seq.

(2) The U.C.C. itself contains provisions which justify such different treatment. Section 2-719(3), U.C.C.,

provides: "Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

Property damage is included in the term consequential damage as defined by the U.C.C. § 2-715(2), U.C.C. It does not appear to me that the U.C.C. provisions justify the distinction that some of the cases make between property damage and consequential commercial damage and which allow recovery under the doctrine of strict liability for the former but deny it for the latter. See Seely v. White Motor Co., 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145. A reading of sections 2-715(2) and 2-719(3), U.C.C., together leads me to believe that the U.C.C. clearly authorizes warranty limitations so far as property damage is concerned.

Second: A primary justification — although often unstated (as it was in Kohler) — for the doctrine of strict liability is that of spreading the cost of risk loss from the injured to the manufacturer who in turn passes that cost on either through insurance or in higher charges for his products. This was the rationale in Greenman v. Yuba Power Products, Inc., 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d 897, on which we placed primary reliance in Kohler. See, also, Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases, 18 Stan. L. Rev. 974, 1009. Damages of the type here involved are ordinarily already covered by insurance, the contractor's collapse or builder's risk policy, or if the contractor is his own insurer he is already spreading the cost of the risk among all his customers. As I see it, there is no social utility in transferring the risk of loss from one insurer to another, in this case probably to the products liability carriers of the scaffold manufacturer and the lessor of the scaffolding. Transferring risk between insurers simply gives rise to additional subrogation claims between insurers and the social utility of this I fail to

see. No doubt a reasonable argument can be made for the fact that it probably increases cost because now both insurers must consider the same risks and consequently be compensated in higher premiums.

The great value which we as a society place upon life and health justifies the strict liability doctrine so far as personal injury is concerned. First party personal injury insurance does not remotely match the damages which are recoverable from a tortfeasor, while ordinarily insurance of the type we have earlier mentioned completely covers the loss and spreads the risks.

Third: I agree with Smith, J., that important information relating to policy in this area is inadequate. This, I believe is an added reason for not expanding the legal liability of the manufacturer beyond our holding in Kohler.