DALE R. BENGTSON, APPELLEE, V. ESTHER B.
BENGTSON, APPELLANT, IMPLEADED WITH OLIVER E.
WISE AND RUTH L. WISE, INTERVENORS-APPELLEES.

284 N. W. 2d 406

Filed October 16, 1979. No. 42358.

Richard L. Swenson of Lathrop, Albracht & Swenson and Charles S. Lashelle, for appellant.

Everett O. Inbody of Haessler, Sullivan & Inbody, for appellee.

Heard before BOSLAUGH, CLINTON, and WHITE, JJ., and HAMILTON and HENDRIX, District Judges.

HENDRIX, District Judge.

This is an appeal from a dissolution of marriage decree determining custody of a minor child. The wife, respondent-appellant, prosecutes this appeal attacking the order of the District Court for Saunders County, Nebraska, which retained legal custody, awarded physical custody in the husband, petitioner-appellee, and granted reasonable visitation to respondent. The parents of the respondent appeared as intervenors in the District Court, but are not parties here. We affirm.

The parties were married February 20, 1971, and began living in the Omaha, Nebraska, area. On September 1, 1973, the respondent gave birth to the parties' only child, Michelle. The pregnancy was planned, and the respondent was happy that she was having the child. During the first year after Michelle was born, the respondent stayed home with her. While the respondent furnished physical care for the child, she had difficulties in adjusting to the pressures of motherhood. At this time the respondent felt she couldn't cope with Michelle and complained that Michelle would "drive her up the wall." About a year after Michelle's birth the respondent wanted to go back to work and the parties agreed that she would do so.. The respondent secured the first of several waitress jobs, working at night. She continued to complain that Michelle bothered her so much she couldn't stand it. It was her custom to leave Michelle at the day care center while shopping or going out to lunch.

For some time the parties continued to share the care of Michelle, with the petitioner working days and caring for Michelle during the night and the respondent working nights and caring for Michelle during the day. During this period there were disagreements about the toilet training of Michelle. The petitioner took a much more firm stand on the matter than did the respondent. In May of 1976 the respondent, her mother, and Michelle took a 2-week trip to near Scranton, Pennsylvania. Respondent and her mother reported that during this trip the relationship between the respondent and Michelle seemed normal.

However, shortly after this trip and about the end of June 1976, the respondent moved away from the family home, leaving Michelle with petitioner. During this time the respondent visited Michelle, but the frequency of the visits is in dispute. Respondent testified she visited at least two times a week, ex-

cept for a couple of weeks. The petitioner testified the respondent visited Michelle once a week for the first couple of months, began skipping weeks, and then at one time it was 4 to 6 weeks without contact with Michelle. In about December 1976, the parties worked out a joint custody agreement by which petitioner would deliver Michelle to the day care center Monday mornings, and respondent would have custody until she delivered Michelle to the day care center Thursday mornings. The petitioner would pick up Michelle Thursday night and have custody until Monday morning.

In about May 1977, the petitioner moved to Yutan, Nebraska. In July the petitioner was laid off work, making it difficult for him to pay the day care center. The parties agreed that the petitioner would then have custody. During this time the petitioner had custody the respondent did not visit Michelle, although she may have tried on one occasion. The parties reestablished the joint custody arrangement in the latter part of July or the first part of August when respondent's parents agreed to pay the expenses at the day care center.

The joint custody arrangement continued this time until September 15, 1977. On September 1, 1977, a Thursday, the petitioner noticed a lesion on Michelle's cheek. On September 15, 1977, petitioner noticed a second lesion. Michelle was taken by petitioner to the emergency room at Nebraska Methodist Hospital where she was examined by Dr. Frank O. Hayworth. Dr. Hayworth testified that the lesions appeared to be second degree burns, one at least 5 or 6 days old and the other 1 or 2 days old. The doctor also stated that it was possible the lesions were caused by burns from a cigarette or any round hot instrument. The trial court found the evidence tended to exonerate both parties, but determined that the lesions occurred while the child was in the custody of the respondent. As a result of the

lesions, petitioner terminated the joint custody arrangement, but it was reinstated October 11, 1977, at a conference of parties and counsel.

In the meantime, both parties became sexually involved with other partners; the respondent with a Nick Watson, and the petitioner with a Penny Nelson. The affair between respondent and Mr. Watson, insofar as Michelle was present, began in late summer or early fall of 1977. It was terminated by respondent in November of 1977. At trial time, respondent was living in an apartment in Papillion. The petitioner met Penny Nelson shortly after he moved to Yutan. This developed into a close relationship and they began living together at the end of July or the first part of August of that year. A baby was conceived of the relationship and was expected to be born April 1, 1978. The petitioner and Penny Nelson planned to marry on September 30, 1978, if the dissolution between petitioner and respondent was final by that time. On February 1, 1978, the petitioner and Penny Nelson moved to Hordville, Nebraska, the petitioner believing that to be a better place to engage in his occupation of carpentry. This is where the petitioner and Penny Nelson were living at the time of the trial. The social service worker who made the study of the home in Yutan reported a physical environment which was clean and neatly arranged. She also reported Michelle had a warm and loving attitude towards her father and Penny Nelson. The social worker who made the study of the home in Hordville reported petitioner and Penny Nelson related well to Michelle and that they were able to provide adequate and suitable care. This and other evidence reveals an atmosphere of mutual love and parental relationship between Michelle on one hand and petitioner and Penny Nelson on the other. The director of the day care center which Michelle attended from about October 12, 1977, related that at first Michelle was apprehensive as to who was

picking her up, and on one occasion became very upset and cried when she found out Penny Nelson was picking her up rather than the respondent. She further testified, however, that the situation had improved, and that she did not at trial time see any difference between the way Michelle received petitioner and Penny Nelson as compared to the way she received the respondent.

The respondent objects to the receipt of copies of social workers' reports into the evidence. In Jorgensen v. Jorgensen, 194 Neb. 271, 231 N. W. 2d 360, we held that such reports are not competent unless the investigator takes the stand as a witness, is sworn, and is subject to the usual test of cross-examination. In this case each social worker was sworn, testified, and was cross-examined. Further, the court advised that in receiving the reports it would only consider the evidence properly admissible. Under these circumstances, there was no error.

Respondent further objects to the court's refusal to permit a Mr. Nanos to answer hypothetical questions relating to possibility and effect of a second parental breakup upon a 4-year-old child. Mr. Nanos was qualified as an expert by virtue of being the assistant director of the alcoholics treatment center of Emmanuel Center, with a masters degree in psychiatric social work and postgraduate work primarily in the field of alcoholism. He had been permitted to testify at great length on theory entirely. He had no personal knowledge of any of the parties or the child. His direct examination covers 39 pages in the bill of exceptions. The line was drawn by the court at the place determined by it to prohibit Mr. Nanos from relating matters only involving speculation, possibility, or conjecture. In dealing with questions calling for expert opinion, particularly hypothetical questions, much must be left to the discretion of the trial judge. Fowler v. Bachus, 179 Neb.

558, 139 N. W. 2d 213; Hawkins Constr. Co. v. Matthews Co., Inc., 190 Neb. 546, 209 N. W. 2d 643. The ruling of the trial judge in this matter was appropriate, and not an abuse of his discretion.

In cases involving questions of child custody, the findings of the trial court, both as to an evaluation of the evidence and as a matter of custody, will not be disturbed unless there is a clear abuse of discretion or the decision is against the weight of the evidence. Mason v. Mason, 200 Neb. 476, 263 N. W. 2d 865. The court chose what appeared to be the more stable home and environment for Michelle. The decision does not abuse the discretion of the court, nor is it against the weight of the evidence.

AFFIRMED.