**COMET INDUSTRIES, INC., Plaintiff,**

v.

**BEST PLASTIC CONTAINER CORPORATION, Defendant.**

Civ. A. No. 7792.

United States District Court
D. Colorado.
Oct. 8, 1963.

Cole & Maley, John T. Maley, Denver, Colo., for plaintiff.

Nathan Lee Baum, Denver, Colo., for defendant.

DOYLE, District Judge.

The above action was tried to the Court following which briefs were filed, oral arguments were had and the matter is now submitted for decision, and formal findings and conclusions are unnecessary. The same will appear in the course of the following opinion.

This is an action in which the plaintiff claims the sum of $24,439.43, together with interest, the said sum being the balance owing on the sale of a certain machine, a Star Press, vacuum-forming with an automatic feed, the same having been furnished for the purpose of manufacturing plastic containers. The sum of $9,000.00 was paid by defendant and the amount demanded represents the alleged balance. There is little controversy as to the correctness of the mathematics; defendant, however, denies that it owes this amount, or any amount. In its answer it has alleged that the machine is defective and that there has been a breach of express and implied warranty. Defendant has also filed a counterclaim in which it seeks damages in the total amount of $200,000.00, the same allegedly being loss directly attributable to the failure of the machine to operate in accordance with the alleged warranties and also representing specific items expended for the purpose of making molds and dies and other items incident to its effort to make the machine work. Plaintiff also demands damages for alleged loss of profits and for delays in delivery and delay in getting the machine into operation.

Harold Best, who then represented defendant, contacted plaintiff's owner, Edward Kostur, at Franklin Park, Illinois, in April, 1960. Best had invented a plastic container with a screw top and had applied for patent. He explained his problem to Edward Kostur and discussed with him the possibility of defendant's building a machine to vacuum form, mold and trim plastic material on a mass production basis. Kostur, who was engaged in the manufacture of this type of machine, indicated that his company was capable of manufacturing a machine of this kind. The next report of a meeting of the parties was in October, 1960, at which time Kostur was in Denver. He met with the persons interested in the defendant company and

they then explained their requirements. They proposed to use 60 millimeter thickness of polyethylene materials for the bottom of the container and 30 millimeter thickness of polyethylene material for the top. Kostur's recommendation was that the machine be designed to form and trim twenty units during one complete cycle. He stated that his machine would be able to perform on an average fifteen-second cycle. According to defendant's testimony Kostur guaranteed that his machine would produce this product in accordance with the specifications; thereupon, a written contract outlining the specifications of the machine was executed. This contract is silent on the matter of the machine's capacity. A $9,000.00-deposit was paid by defendant to plaintiff. The purchase price agreed upon was $30,000.00 plus or minus ten per cent. It was to have been delivered in four months.

Plaintiff thereafter manufactured the machine and the Best Company undertook to manufacture the dies and the molds. While the machine was in process, defendant sent its tool and die-maker to Franklin Park, Illinois, where plaintiff's factory was located, with a sample of the dies and molds. On that occasion Kostur had one of the men in his plant prepare and give to the defendant's representative the drawing of the type of die-holder for the dies and molds. According to the testimony of defendant this was prepared in accordance with the drawing; it is noted, however, that this drawing was not a blueprint but was just a sketch. The machine did not arrive until May, some two months after it was supposed to have been delivered, and although no blueprint accompanied it, defendant proceeded to set the machine up and to connect it. Although the specifications provided for electric drive, the machine, when it was delivered, was found to have a hydraulic drive. According to Kostur this was furnished so as to provide the added pressure necessary to accomplish the particularly difficult trimming job which was demanded.

After the machine was set up defendant requested that service men come to their plant and plaintiff sent such a representative. On this occasion the dies and molds were not completed. Plaintiff's representative dry-cycled the machine and made some adjustments. After the completion of the dies and molds an attempt was made to operate the machine, that is, to form and trim actual material. Difficulties were encountered at once. The clips which had been furnished to convey the material through the oven and into the machine would grip through the plastic material whereby the plastic would fall into the oven and burn. When they finally succeeded in getting the material into the molding area the machine would not mold the containers. These difficulties were explained at great length and it appeared that when pressure was applied in order to bring the platens together the guideposts at the corners of the machine would bend as much as three-quarters of an inch; furthermore, the platens of the machine would not stay parallel. This was explained by the fact that the hydraulic cylinder was two inches off center, resulting in unequal pressure being applied to various areas of the platens. As a consequence, the machine would not trim twenty containers during a cycle.

Complaint was again made to plaintiff and a service man was sent who again tried to make the machine operate. He finally said he could do no more. Arrangements were then made for Edward Kostur to come to Denver to see if he could make the machine operate and he arrived in June, 1961. A machinist, or machinists, were assigned to Kostur to help him and he worked with the machine for a few days and finally said that the fault was not with the machine but with the dies and molds (which had been designed and manufactured by defendant). He said that there were no further repairs or alterations which could be made and that none were necessary. On this occasion Harold Best told Kostur that the matter was in the hands of Best's lawyer.

During the next few months defendant made extensive efforts to repair the machine and to make it work. The conveyor system was changed substantially; tht size of the oven was cut down; an I-beam was placed across the top of the machine to steady it. This work continued from June until October, 1961, at which time defendant concluded that it was impossible to make the machine operate.

There was expert testimony on both sides: that which was offered on behalf of the defendant was to the effect that the machine was incapable of doing the job for which it had been designed; that it was so structurally deficient that it could not withstand the high pressures necessary to form and trim the polyethylene material which was to have been used in it; furthermore, the hydraulic unit was very considerably off center so as to produce unequal forces in various areas. The guideposts deflected under pressure substantially; the tolerance between the supporting guideposts and bushings was grossly excessive, contributing substantially to the imprecision and deflection. The platens or presses were too light to accomplish the purpose for which they had been manufactured. The supporting spiders were also inadequate in strength. Several witnesses observed the deflection in the platens as the machine cycled and assigned this to the fact that the hydraulic cylinder was off center, plus the fact that there was a general lack of precision in the design and consequent operation of the machine. One expert witness said that the machine was not safe to operate—that if it were placed in production it would certainly fail. Another expert said that even if it could be adjusted to operate, its productive life under the production demands would not exceed thirty days. The recommendation of the experts was that the machine be abandoned.

The plaintiff's experts took the position that the fault rested with the dies and molds; they also offered the suggestion that guide pins would result in the machine's operating with precision.

From a consideration of the testimony of all the experts it seems clear that the machine was not capable of performing in accordance with its design and purpose. The evidence is also clear that the machine lacked the necessary strength and precision.

There was also evidence on both sides as to the reasonable market value of this machine in its defective condition. Testimony on behalf of the defendant was that the machine had a market value of $6,000.00. That on behalf of plaintiff was that it had a value of, according to one witness, $18,000.00, whereas according to another witness, the younger Kostur, it had a value substantially in excess of this, somewhere around $20,000.00. There was also evidence showing that very substantial expenditures were made by the defendant. These included the cost of manufacture of the dies and molds plus the expenses incurred in efforts to make the machine operate correctly.

The respective contentions define and limit the scope of conclusion and decision by raising the following issues:

I. Whether the defendant has proven that there was a breach of express or implied warranty.

II. Whether, even accepting that there was a breach of warranty, the defendant failed to give the requisite statutory notice and is barred by reason of this fact.

III. What the appropriate remedy is where a buyer elects to retain the goods (here a machine) and thus to affirm the transaction.

IV. How damages are to be measured and, specifically, to what extent consequential are damages recoverable.

### I.

The Uniform Sales Act, C.R.S.1953, 121–1–12, defines an express warranty as:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the

natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

The only document which might be regarded as a written memorandum is Exhibit 1, a letter addressed to defendant signed by plaintiff, which letter describes the machine in question. This document contains considerable specific detail but does not include a provision as to its ability to produce. In addition, it appears that there were numerous conversations between the parties and that defendant fully explained to plaintiff that the machine was to be used on a mass production basis. Its intricacies were also made known to plaintiff from the beginning in that it combined the forming and trimming and involved heat control together with an automatic feeding mechanism. It cannot be said that the writing excluded undertakings by plaintiff in the light of the defendant's requirements that plaintiff produce a machine which would fulfill specific needs. Indeed, plaintiff's standard machines were mass production units. That plaintiff expressly undertook to produce the machine in accordance with defendant's order and that defendant was induced to purchase upon the basis of the undertaking is abundantly clear.

The expressions which are found in the opinion of the Supreme Court of Colorado in Rudd v. Rogerson, 133 Colo. 506, 297 P.2d 533, are here applicable. In that case the Court said:

"The affirmation of fact in the instant case is the statement, oral and written, prior, contemporaneous and subsequent, that the cattle were registered Aberdeen Angus cattle, plus the detailed description of the specific cattle. Certainly, the 'natural tendency of such affirmation or promise' was 'to induce the buyer to purchase the goods * * * rely-

ing thereon.' The object of the writing was to affirm, represent and promise, and this is all that is required."

The particular form of the warranty is unimportant. See Denver Suburban Homes and Water Co. v. Fugate, 63 Colo. 423, 168 P. 33.

The Uniform Sales Act, C.R.S.1953, 121–1–15, also provides that there is an implied warranty where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment. This provision goes on to provide that such warranty is present whether the seller is the manufacturer or not. The seller in such instance warrants that the goods are fit for the purpose for which they are purchased. There is also ample evidence that defendant in the case at bar made known to plaintiff the purpose for which the machine was to be used and that defendant relied on the seller's skill and judgment. Plaintiff here was the manufacturer and thus the reliance was all the more justified.

It has also been held that:

"The buyer's particular purpose may be equivalent to nothing more than his general purpose, or it may relate to his more specific purpose. Fitness for a particular purpose may be merely the equivalent of merchantability. In such a case, the warranties coexist and a recovery may be founded upon either. Under the Uniform Sales Act, a dealer who sells articles which ordinarily are used in but one way impliedly warrants fitness for use in that particular way, unless there is evidence to the contrary. This is only a warranty of merchantability." 46 Am. Jur. 530, 531, § 346, Sales.

■ As to breach of warranty, the evidence is not only sufficient to satisfy defendant's burden of proof, by a preponderance of the evidence, that breach of warranty is more likely so than not so;

it is overwhelming that the machine was not capable of performing the function in accordance with the plaintiff's express and implied undertakings. The supporting guideposts were inadequate; the platens and their supporting spiders were relatively insufficient. The machine's imprecision, resulting from excessive tolerances; its general lack of rigidity and strength; and the off-center position of the hydraulic cylinder made it impossible to adapt or adjust the machine. From this most persuasive evidence which was given by disinterested experts it must be concluded that the machine was not fit for the purpose for which it was sold and that there was a breach of express and implied warranties. This conclusion is also supported by the evidence showing lack of interest in correcting the situation on the part of plaintiff. This was a non-standard, somewhat experimental machine and one would reasonably expect the manufacturer to stay with it until it was made to work, or to use some alternative method. Plaintiff simply walked away and did so with knowledge that the machine was highly unsatisfactory. Plaintiff's position at the trial that guide pins would have cured the defects lacks persuasiveness in view of its failure to either suggest such a course at the time or to seek to make such an adjustment.

## II.

Plaintiff next argues that, even assuming a breach of warranty, inadequate notice was given. He argues that the notice contemplated must effectively advise the seller of the intention of the buyer to assert a breach of warranty. Here defendant made numerous phone calls. Plaintiff in turn sent its representative to defendant's premises on two occasions. At last plaintiff's president came in person. After his efforts failed he took the position that the machine's difficulties were due to tools, dies and supports—that the machine was sound, or at least susceptible to correction of deviations by the mere installation of guide pins. The question now is whether under the related circumstances this "notice" argument is valid.

Section 49 of the Sales Act, C.R.S. 1953, 121–1–49, does indeed provide that, if after acceptance of the goods the buyer fails to give notice to the seller of the breach of any warranty within a reasonable time when the buyer knows of the breach, the seller shall not be liable therefor. The provision does not prescribe the kind or the form of the notice and the cases differ as to how formal such notice must be. The decision of the Colorado Supreme Court in Scarry & Co. v. Paper Products Co., 122 Colo. 589, 224 P.2d 940, holds that where a purchaser makes repeated promises to pay the contract price after acceptance of the goods, he can not thereafter claim damages for breach of warranty. After citing section 49, supra, the Court said, 224 P.2d at page 943:

"Under this statute defendant had the burden of proof of establishing the fact that notice of the broken promise or breach of warranty was given to plaintiff within a reasonable time after it knew, or should have known, that the performance of plaintiff was objectionable. Upon defendant's own evidence, this knowledge of the asserted defective performance was acquired by it immediately upon delivery and acceptance of the merchandise.

"Even prior to the adoption of the Uniform Sales Act, when the majority rule did not require such notice as a condition precedent to the right to sue for damages for defective performance after the acceptance of goods by a purchaser, strong statements are found in the decided cases directing attention to the reasons for adopting the statutory provision requiring notice. In the early case of Day v. Pool, 52 N.Y. 416, we find the following: 'Of course, there is danger of fraud and false claims, even where there is an express warranty, when notice is not early given of the defect. It leads the buyer into temptation. Hence,

juries should listen to such claims (never presented when their falsity could have been ascertained) with great caution. The proof thereof should be more clear than if the buyer had acted with the frankness of an honest man, willing to allow his claims to be tested. This is so declared by courts, while the rule is maintained as to an express warranty as above stated.'

"In the case at bar there is no competent evidence tending to establish that the notice of defective performance which the statute requires was ever given to plaintiff by defendant. The correspondence between the parties indicates clearly that no such notice was within the contemplation of defendant, and that none, in fact, was given. The giving of notice, was a condition precedent to defendant's right to recover for any claimed damage, and it necessarily follows that it failed to prove a claim for diminution of the purchase price of the goods, or for damages of any kind."

Thus, the entire purpose of notice is to protect the seller—to give him an opportunity to check the complaints.

Although in the case at bar a formal notice was not given, it cannot be said that buyer failed to communicate with the seller and to notify him of the defects in the machine. Moreover, the seller acquired firsthand knowledge, and he could scarcely have concluded that these were mere protests in view of the fact that the buyer told him that the matter was in the hands of his attorney.

■ There are a good many cases which are strict in requiring that the notice be formal. No evidence, however, has been offered which would indicate that Colorado follows this approach. Therefore, notwithstanding that the buyer in the case at bar did not express in precise terms its intention to sue for breach of warranty, it is concluded that the spirit of Section 49 was complied with here.

### III.

■ The various remedies for breach of warranty are set forth in Section 69 of the Sales Act, C.R.S.1953, 121–1–69. These remedies contemplate that the buyer shall have either rescinded or affirmed the transaction; in the former instance restitution is the remedy, whereas in the latter situation the buyer seeks damages. Subsection (a) allows the buyer to accept the goods and to assert the breach of warranty by way of recoupment in diminution or extinction of the price; subsection (b) permits acceptance and retention of the goods and maintenance of an action for breach of warranty. This latter remedy would be available by way of counterclaim rather than complaint since this is an "action."

Defendant here has pursued both—the remedy afforded by subsection (a) and that prescribed in subsection (b), supra. Both of these involve affirmance of the transaction and thus are not logically inconsistent or incompatible provided that damages are not duplicated. Defendant is within its rights in asserting the recoupment remedy for those damages which are directly and naturally attributable to the deficiencies of the machine; the other damages directly and naturally resulting from the breach of warranty can be claimed by way of counterclaim.

### IV.

What, then, is the measure of damages attributable to the deficiencies in the machine, which are asserted by way of recoupment?

■ The proper measure for breach of warranty of quality is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had had they complied with the warranty. Defendant has offered evidence seeking to establish the reasonable market value of the machine at the time of delivery. According to its witnesses this value was $6,000.00. Defendant's witnesses conceded that the machine was not junk, that it could form plastic containers but could

not do so in accordance with defendant's needs. As to the market value, if it had been in accordance with the warranties, defendant has adopted the purchase price as the measure and is thus seeking an out-of-pocket measure rather than that of loss of bargain.

The seller also offered testimony as to reasonable market value of the machine, assuming its defects. Defendant's witnesses testified that the machine is worth, according to one, $18,000.00, and according to the other (the son of plaintiff's President), $20,000.00. There is also evidence showing that the cost of a standard Comet Star Press with a vacuum system is $11,625.00. This figure does not take into account the conveyor system (which did not work) and the hydraulic unit which was misplaced. These items cannot be wholly disregarded and yet, they are not entitled to be treated as worth the cost of their manufacture.

Upon the basis of all of the testimony, it is concluded that the machine in its defective condition had a reasonable market value of $12,000.00. Thus, the proper measure of defendant's damage would be the difference between $12,000.00, the machine's actual value, and $32,500.00, the purchase price, or $20,500.00. It is to be noted that defendant has paid the sum of $9,000.00 and thus would owe $23,500.00 on the purchase price; therefore, the balance owing to plaintiff, giving defendant credit for the $20,500.00 damages directly attributable to the defects, is $3,000.00. Plaintiff is entitled to interest on that amount from the due date of the last payment agreed upon.

The final problem is the amount, if any, which the defendant is entitled to recover for special damages. In this connection, it is important to note that we are here concerned with the breach of a special warranty whereby plaintiff undertook to build a machine suitable for a mass production purpose. Thus, it was apparent to the plaintiff that if the machine was not in accordance with the undertaking that defendant would suffer other and related damages. Schlottman, et al. v. Pressey, et al., 9 Cir., 195 F.2d 343. Defendant has invested $2,137.75 in wages and $4,135.65 in the manufacture of the dies and molds. These dies and molds were destroyed as a result of the misalignment of the platens. The undisputed evidence is that their value as scrap is $25.00. Therefore, defendant is entitled to the total cost of the dies and molds, or $6,273.40 less $25.00, leaving a balance of $6,248.40.

Defendant has also incurred substantial expense in its efforts to adjust and repair the machine. Much of this expense was incurred in what appears to have been a reasonable and good faith effort to mitigate the damages, and it must be concluded that such efforts were properly foreseeable as a result of breach of warranty. See Schlottman v. Pressey, supra, and Williston on Contracts, vol. 5 (rev. ed.) p. 3789, § 1354, and 33 A.L.R. 2d 511, 521. Therefore, the date when the knowledge or notice was brought home to the defendant is the important one, and not the date when defendant made its decision to spend no more money. This latter date was October 27, 1961. One of defendant's witnesses was Mr. Ed Held. He testified to the gross inadequacy of the machine, but his investigation was made on July 10, 1961. Furthermore, Kelley, the machinist for defendant, was convinced early in July that further efforts would be futile. He so testified. Therefore, costs and expenses after July 10 appear to the Court to be unreasonable and the same should be, and are disallowed.

As to the defendant's claim for damages for loss of profits, the conclusion is that, *first*, these were not sufficiently proven, and *secondly*, that they are in law remote. See California Press Mfg. Co. v. Stafford Packing Co., 192 Cal. 479, 221 P. 345, 32 A.L.R. 114, and see also Peppers v. Metzler, 71 Colo. 234, 205 P. 945.

Finally, therefore, defendant is entitled to damages for its expenditure in the manufacture of the tools and dies and is also entitled to those expenses reasonably attributable to the efforts which were made prior to July 10, 1961. Since

the proof with respect to this latter class of damages was not offered in relation to particular cut-off dates, it is necessary in view of this finding and conclusion that the parties stipulate as to the amount of the expenditure attributable specifically to repair efforts as of July 10; or, if it is impossible for the parties to agree on this, a further hearing will be held. It is, therefore,

Directed that counsel for defendant prepare a judgment calculating the amount which is owing to the defendant consistent with the above findings and conclusions. This involves the giving of credit of $3,000.00 due plaintiff as balance due on the purchase price, plus appropriate interest, and a determination of the total amount of defendant's damage as above set forth and determined, less the mentioned $3,000.00 item. Counsel are directed to present the judgment within ten (10) days after the receipt of these findings, or to notify the Court of their inability to stipulate the repair item so that a hearing can be had at the earliest possible date if such a hearing is necessary.