COMMUNITY TELEVISION SERVICES,
INC., a corporation, Appellee,

v.

DRESSER INDUSTRIES, INC., a
corporation, Appellant.

No. 77–1750.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 17, 1978.

Decided Sept. 13, 1978.

Rehearing and Rehearing En Banc
Denied Nov. 24, 1978.

Gibson, C. J., dissented from denial of petition for rehearing en banc and filed opinion in which Bright and Ross, Circuit Judges, joined.

Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., argued, for appellant; G. Alan Cunningham and David P. Pearson of Faegre & Benson, Minneapolis, Minn., Harold C. Doyle of May, Johnson, Doyle, Becker & Fisher, Sioux Falls, S. D., and Robert W. Patterson, Chicago, Ill. (argued), and Mary S. Nissenson, Chicago, Ill., on brief.

Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., argued, for appellee; Ellsworth E. Evans and Deming Smith (argued), and Edwin E. Evans, Sioux Falls, S. D., on brief.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

Dresser Industries, Inc. appeals from a judgment of the district court in the sum of $1,274,631.60,[1] awarded to Community Television Services, Inc. for damages arising from the collapse of a 2,000 foot television and radio broadcasting tower on January 11, 1975. Dresser designed, manufactured, and erected the tower for Community. The jury, answering special interrogatories, rejected Community's alternative claims of negligence and strict liability, but found for Community under breach of express warranty.[2] On appeal, Dresser argues that: (1) the verdict for Community is not supported by the evidence, and (2) the trial court erred in failing to enforce the limitation of liability provisions of the sale contract. Upon review of the entire record, we affirm the judgment for Community.

*Background.*

Community Television Services, Inc. is a corporate entity formed in about 1965 by two South Dakota based broadcasting stations, KELO and KSOO, for construction near Rowena, South Dakota, of a 2,000 foot tower to broadcast television signals for both stations. Contract negotiations were entered into with Dresser, who fabricated and erected the tower. The tower became operational in August of 1967. On June 22, 1968, the tower collapsed when an airplane clipped and severed a supporting cable. Dresser erected a replacement tower, which became operational in May of 1969. Included in the terms and conditions of the contract between Dresser and Community for the replacement tower was the warranty and limitation of liability provision at issue in this appeal. The only significant variance between the two contracts was an increase in the tower's price in 1968 to $385,000.

A relatively thin metal structure, the tower was comprised of a mast and three interconnected legs held in balance by guy cables set to an appropriate tension. An antenna was placed on top of the tower for broadcasting television and FM radio signals. Community had the tower regularly inspected and properly maintained. The only significant maintenance operation was retensioning of certain guy cables by an independent contractor retained by Community.

On January 10 and 11, 1975, a severe winter blizzard occurred in the area where the tower was located. During the early morning hours of January 11, as the storm

---

1. The jury actually assessed damages in the amount of $1,385,001.61. The trial court conditioned denial of Dresser's motion for judgment notwithstanding the verdict or in the alternative for new trial on remittitur of the damage award to the amount of the judgment. Community does not challenge the remittitur on appeal. *See Community Television Serv. v.*

*Dresser Ind., Inc.,* 435 F.Supp. 214 (D.S.D. 1977).

2. At the close of all the evidence, the trial court granted Dresser's motion for directed verdict on the implied warranty count, holding that disclaimer provisions in the sale contract complied with the South Dakota Commercial Code and were effective against implied warranties.

reached its height with wind speeds near the top of the tower of up to 80 miles per hour, the tower collapsed. Expert witnesses called by both sides differed in their opinions as to the cause of the collapse. Community's experts testified that they had eliminated metallurgical or mechanical failure or abnormal wind loading as the cause of collapse. They theorized that the cause was high winds setting up a phenomenon known as mechanical resonance. They concluded that because of the resonance, the tower members "were inadequate to support the load that they sustained." On the other hand, Dresser's experts testified that a combination of ice, snow and wind subjected the tower to a total force greater than the ultimate capacity of its structural elements. They theorized that a substantial accumulation of rime ice[3] on the upper fourth of the tower enlarged the tower surface area exposed to the wind, thereby subjecting the tower members to a greater load than their designed wind loading capacity. Community attempted to refute Dresser's rime ice theory by calling several witnesses who testified that they did not see any such ice on or near the area where the tower collapsed. In turn, Dresser countered Community's theory through expert testimony that relatively constant winds were necessary for resonance to begin, and the winds were gusty and varied in speed and direction at the time of collapse. Furthermore, Dresser argued that the warranty did not guarantee against mechanical resonance, and experts testified that its prevention was beyond the current state of the art.

*Creation and Scope of the Warranty.*

The specifications incorporated in the sale contract included a specified "Design Wind Load," which set forth the tower's capacity to withstand wind velocity as measured in pounds of pressure per square foot against the flat surfaces of its members. The specification reads: "The tower shall be designed to resist a uniform wind load per drawing T–5172, sheet S–1, 60 psf on flats." The trial court instructed the jury that this specification constituted an express warranty that the structure would withstand wind exerting pressure of 60 pounds per square foot on the flat surfaces of the tower.[4] Dresser's advertising materials and the testimony of experts at trial revealed that the wind velocity necessary to create 60 pounds of pressure on the flat surfaces of the tower would be approximately 120 miles per hour. The evidence showed that the wind loading specifications referred, at least in engineering parlance, to "a force caused by the wind that is introduced parallel to the ground . . . [which] would be tending to blow the structure over."[5]

---

3. Rime ice is formed when water droplets, existing in clouds at temperatures below freezing, instantaneously crystallize and freeze as they collide with a structure. In contrast to the more dense and clear glaze ice, rime ice is virtually indistinguishable from snow.

4. U.C.C. § 2–313(1)(a), (b), which was enacted by South Dakota without change, S.D. Compiled Laws Ann. §§ 57–4–25, 26 & 27 provides:

Sec. 2–313. Express Warranties by Affirmation, Promise, Description, Sample.

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Dresser concedes on appeal that the specification created an express warranty.

5. The mathematical formula to compute the wind velocity necessary to exert 60 pounds of pressure *per square foot* is not contested and was described by one of Community's experts as follows:

A. The density of air at sea level, using a standard atmosphere, is computed to be .002378 slugs per cubic foot, and if we use 60 pounds per square foot, that would be equal to then one-half this .002378 times the square of the air velocity in feet per second, so if we compute it back the other way, it would be—I read that that would be about 224.6 feet per second in that case for a 60 psf load, and if we converted that to miles per hour, that would be about 153, I believe.

Q. All right. That's 153 miles an hour?

A. Yes.

Dresser argues that the trial court erred in failing to direct a verdict on the express warranty claim or grant it judgment notwithstanding the verdict, because expert testimony that the tower met the design specification was uncontradicted. Community's own experts stated unequivocally that in their opinion the tower conformed in a mathematical or analytical sense to the 60 pounds per square foot wind loading specification. If the warranty may be restricted to the technical specification set forth in the written contract, we would find Dresser's argument convincing. However, we agree with Community that the warranty was amplified, in advertising materials Dresser gave to Community prior to purchase of the first tower, to promise more than mere compliance with technical measurements. In an advertising catalog, Dresser made the following supplementary affirmation:

> Wind force creates the most critical loads to which a tower is normally subjected. When ice forms on tower members thereby increasing the surface area resisting the passage of wind, the load is increased.
>
> Properly designed towers will safely withstand the maximum wind velocities and ice loads to which they are likely to be subjected. Dresser-Ideco can make wind and ice load recommendations to you for your area based on U. S. Weather Bureau data.[6]

■ Although we agree with Dresser that a seller cannot be held to be the insurer of its product, Dresser nevertheless provided the catalog to Community to induce purchase of its product, and in the absence of clear affirmative proof to the contrary, the above affirmation must be considered part of the "basis of the bargain." S.D. Compiled Laws Ann. § 57–4–26; Comment

3 to U.C.C. § 2–313; *Drier v. Perfection, Inc.,* S.D., 259 N.W.2d 496, 502 (1977); *Hawkins Construction Co. v. Matthews Co.,* 190 Neb. 546, 565, 209 N.W.2d 643, 654 (1973). Standing alone, the statements provide a warranty that Dresser's tower would be properly designed so as to safely withstand the maximum wind velocities and ice loads to which it would likely be subjected. Dresser did not indicate that this broad affirmation was superseded or cancelled by the technical specification in the contract. *Cf. Braniff Airways, Inc. v. Curtiss-Wright Corp.,* 411 F.2d 451, 455 (2d Cir.), *cert. denied,* 396 U.S. 959, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969), 400 U.S. 829, 91 S.Ct. 59, 27 L.Ed.2d 59 (1970). When the affirmation is read in tandem with the contract, as part of the "fabric" of the agreement of the parties, *see* Comment 3 to U.C.C. § 2–313, it enlarges the warranty created by the technical wind loading specification, giving evidence of its full intent and scope. *See Collins v. Uniroyal, Inc.,* 126 N.J.Super. 401, 315 A.2d 30 (1973), *aff'd* 64 N.J. 260, 315 A.2d 16 (1974); *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364, 371 (E.D.Mich.1977).

We find that the statements in the advertising catalog, which supplement the wind loading specification, could reasonably have been found by the jury to be an affirmation of fact or a promise concerning the actual durability or performance of the tower during the wind and ice storms to which it was likely to be subjected.

*Proof of Breach.*

■ Although Dresser's defense was that the tower collapsed by reason of excessive loading due to ice on the tower members, no disclaimer or limitation of the warranty that a properly designed tower would safely withstand the maximum wind and

---

This was described as a conservative figure, the highest wind speed that could exert 60 pounds of pressure. Lower speeds, such as the 120 miles per hour speed given in Dresser's advertising catalog, apparently result from use of a different figure for density, .003 or .004, in the equation.

**6.** On another page, in a description of the towers, the following language appears:

In the winter, loaded with ice and hammered repeatedly with gale force winds, these towers absorb some of the roughest punishment that towers take anywhere in the country . . . yet continue to give dependable, uninterrupted service.

ice loads to which it was likely to be subjected appeared in the advertising materials or the contract. Under the *integrated* warranty given, a purchaser could reasonably assume that the tower, if properly designed for its location, would withstand maximum wind speeds to which it was likely to be subjected, even if ice accumulated on the tower members. While the blizzard was a severe one, the evidence does not support the conclusion that the wind alone, or the combination of wind and ice which Dresser claimed caused the collapse, was not within the range of storm conditions to be reasonably contemplated for the tower's location.[7] Breach of a warranty created by statements describing the specific capacity of goods is proved when the product is shown by direct or circumstantial evidence to have failed to perform reasonably and safely the function for which it was intended by the manufacturer. *Drier v. Perfection, Inc., supra,* 259 N.W.2d at 504; *see also Swenson v. Chevron Chemical Co.,* S.D., 234 N.W.2d 38, 42–43 (1975); *S–C Industries v. American Hydroponics System, Inc.,* 468 F.2d 852, 855 (5th Cir. 1972). In view of the affirmation made in the catalog, there was sufficient evidence for the jury to reasonably find that the tower was not as durable as it was warranted to be.[8]

Viewing the evidence in the light most favorable to Community, and assuming all conflicts in the evidence were resolved by the jury in Community's favor, *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 857 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Heiser v. Rodway,* S.D., 247 N.W.2d 65, 68–69 (1976),

we conclude that there is sufficient evidence to support the jury's finding of breach of express warranty.

*Contractual Limitation of Liability.*

On the back of each page of the two-page sale contract is a printed form entitled "Terms and Conditions of Sale," which includes a warranty and limitation of liability clause, hereafter referred to as item nine. Dresser contends that this clause precludes it from incurring any liability for breach, or alternatively, limits its liability to the purchase price of the tower—$385,000 less depreciation.[9]

In item nine, Dresser warrants that its product will be free of defects in material and workmanship and will meet applicable specifications. The warranty is limited to those defects for which the buyer submits a written claim immediately upon discovery, and in any event, within six months from final acceptance. The buyer's remedies for breach of the warranty are limited to repair, replacement, or refund of an equitable portion of the purchase price of any product Dresser determines to be defective or finds failed to meet applicable specifications. Dresser has the sole option of deciding which remedy it will provide. Item nine states that this limited warranty is in lieu of all other warranties, and the purchase price is based on the limitation of Dresser's liability and the buyer's waiver of any claim for damages.[10]

The trial court refused to enforce the limitations of Dresser's liability set forth in item nine. Judge Nichol specifically held that the six month period was a "manifestly

---

7. The trial judge surmised that the jury did not believe that ice and snow were a contributing factor in the collapse. The findings of the jury, however, are inherent in its verdict, and a court's inquiry must simply be whether there exists substantial evidence to sustain the verdict.

8. Proof of a specific defect was not essential to Community's recovery on the breach of express warranty count. *Drier v. Perfection, Inc., supra,* 259 N.W.2d at 504.

9. Community actually recovered $950,295.24 for replacement cost less depreciation of the tower and $324,339.36 for replacement cost less depreciation of the antenna and adjacent

buildings, for a total judgment of $1,274,631.60. The standard measure of damages, difference in value as accepted and as warranted, S.D. Compiled Laws Ann. § 57–8–36, was not used. Dresser does not challenge the manner of calculating damages.

10. Item 9 provides in part:
   9. WARRANTY AND LIMITATION OF LIABILITY: Seller warrants, for a period of six months, that products of its own manufacture and any construction performed hereunder by the Seller shall meet the applicable specifications incorporated in this contract, and be free from defects in material and workmanship. Provided Buyer submits a

unreasonable" time for discovery and notification of breach under Section 57–1–14 of the South Dakota Commercial Code, in light of the tower's twenty-five year average useful life.[11] Dresser argues that under the South Dakota Commercial Code, a seller's warranty does not extend to future performance absent explicit agreement to the contrary. *See generally, Binkley Co. v. Teledyne Mid-America Corp.*, 460 F.2d 276 (8th Cir. 1972). Dresser also contends that the six month discovery period is a reasonable commercial agreement on when to transfer risk to the buyer, based on inspection and maintenance obligations. In the alternative, if six months is an unreasonably short period of time to transfer risk, Dresser argues that five years—the time lapse from erection of the tower to notice of collapse—is an unreasonably long period, and the trial court should have set a reasonable time.[12] In addition, Dresser urges that the limitation of remedy provision in item nine provided the buyer with a reasonable and adequate remedy, which contrary to the trial court's finding, did not fail of its "essential purpose." South Dakota Compiled Laws Ann. § 57–8–50; U.C.C. § 2–719(2). Dresser contends that the trial court's holding, particularly as it affects the limited remedy agreed upon by Community and Dresser, will create serious problems in enforcement of commercial agreements between parties with relatively equal bargaining power.

■ We conclude that it is not necessary to review the trial court's holding that the contractual clauses limiting liability and remedy were invalid. We find that the limitation clauses apply only to the limited and purportedly exclusive warranty set forth in item nine, and not to the broader warranty created by the affirmation made in Dresser's advertising materials.

The six month notification period relates to the warranty that Dresser's products and construction "shall meet the applicable specifications incorporated in this contract, and be free from defects in material and workmanship." Similarly, the limitation of remedy provision applies to "any product or work which seller determines to have been defective or failed to meet applicable specifications." In attempting to assert the clauses within item nine as a defense, Dresser overlooks the fact that the jury found Dresser was not liable on the negligence and strict liability counts. Thus, the jury did not find that Dresser's product or construction was defective in materials or workmanship or failed to meet the applicable specifications. *See McIntyre v. Everest & Jennings, Inc.*, 575 F.2d 155, 159 (8th Cir. 1978). Indeed, if the advertising materials were omitted from the bargain, we would be constrained to agree with Dresser that the undisputed evidence showed that the technical 60 psf wind loading design specification was met.

claim in writing to Seller immediately upon its discovery and in any event within six (6) months after shipment if no construction is performed hereunder or within six (6) months after final acceptance by Buyer if construction is performed (or within six months from notification of completion by Seller if Buyer wrongfully refuses or delays final acceptance), Seller shall, at Seller's sole option, repair, replace or refund an equitable portion of the purchase price of any product or work which Seller determines to have been defective or failed to meet applicable specifications. . . .

Except for obligations expressly and specifically assumed under the other clauses of these Sales Terms, the foregoing is Seller's only warranty, obligation, and liability, under tort (including alleged negligence) contract or otherwise for or in connection with its products, work and services or use thereof. THE FOREGOING IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES WHATSOEV-

ER, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS. IT IS SPECIFICALLY UNDERSTOOD SELLER'S PRICE IS BASED UPON THE FOREGOING LIMITATION OF LIABILITY AND BUYER'S WAIVER OF ANY AND ALL CLAIMS FOR DAMAGES.

11. Section 57–1–14, which is identical to U.C.C. § 1–204(1), provides in part:

Whenever this title requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement. What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

12. We note the defense of the statute of limitations was not raised in the pleadings and is not argued on appeal as such.

However, Dresser's affirmation in its advertising catalog went beyond the limited warranty in the written contract and created a promise concerning the tower's durability much broader than mere compliance with the 60 psf specification. Dresser promised Community that a nondefective, properly designed tower would "safely withstand the maximum wind velocity and ice storms to which [it is] likely to be subjected." This broad warranty of performance clearly falls outside the limited warranty provided in item nine. *Cf. S–C Industries v. American Hydroponics System, Inc., supra,* 468 F.2d at 855; *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp., supra,* 428 F.Supp. at 371. Thus, the jury could reasonably have found that the tower was not defective in materials or workmanship and met the technical specifications, but did not live up to its promised performance capacity.

Item nine does not limit the duration of the express warranty of durability or performance evident from the overall agreement of the parties as evidenced by the catalog, nor limit remedy for its breach. *S–C Industries v. American Hydroponics System, Inc., supra,* 468 F.2d at 855. Nor does the general disclaimer of all warranties other than the limited one set forth in item nine restrict Community's right to recover. Under Section 57–4–34 of the South Dakota Commercial Code,[13] language which limits or negates an express warranty is inoperative when it cannot reasonably be construed consistently with language which creates the warranty. If the limited warranty were exclusive, it would limit the wind loading specification to its technical content and negate the express warranty of durability or performance. In *S–C Industries v. American Hydroponics System, Inc., supra,* a seller argued that a printed special warranty against defects similar to the one in question here, which stated that it superseded all other warranties, precluded recovery for breach of a specific express warranty created by technical loading specifications. The court stated:

> The general language of that special warranty does not mention the written express warranty which [seller] had given [buyer]. The only reasonable interpretation that can be placed on this special warranty in light of the prior specific warranty, is that it applies only to any defects which might be found to exist in the various components and other materials which [seller] sold. Thus, while the special warranty form provided the exclusive remedy should any component be defective, it did not supersede the specific express warranty which extended to the design capability of nondefective structural members intended to perform as an integral part of the greenhouse building.

468 F.2d at 855.

We conclude that there is sufficient evidence to support the finding that Dresser breached its warranty that the tower, when free from defects in materials and workmanship and properly designed for its location, would withstand the wind and ice loads to which it would normally be subjected. The terms and conditions of sale in the written contract do not apply to the warranty, and therefore cannot limit Dresser's liability for its breach.

Accordingly, the judgment is affirmed.

## ORDER DENYING REHEARING EN BANC

The petition for rehearing en banc is denied.

LAY, HEANEY, STEPHENSON, HENLEY and McMILLIAN, Circuit Judges, vote to deny the petition.

GIBSON, BRIGHT and ROSS, Circuit Judges, vote to grant the petition.

---

13. S.D. Compiled Laws Ann. § 57–4–34, U.C.C. § 2–316(1), provides:

> *Construction of words or conduct tending ·to negate or limit express warranty inoperative.* Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of chapter 57–3 on parol or extrinsic evidence (§ 57–3–4) negation or limitation is inoperative to the extent that such construction is unreasonable.

GIBSON, Chief Judge, dissenting, in which BRIGHT and ROSS, Circuit Judges, join.

I respectfully dissent from the denial of a rehearing *en banc.* Upon greater reflection it appears that the panel opinion contains two areas of difficulty. First, it finds liability based on supposed warranties contained in a catalog distributed years before the parties contracted for construction of this tower. Second, it refuses to enforce contractual clauses limiting Dresser's liability to the repair or replacement of the tower, or refund of the purchase price.

In my view, the evidence was sufficient to uphold the jury verdict of liability based on breach of the express warranty contained in the written contract. Since I believe the evidence supported a finding of liability on at least one theory, it would be counterproductive to rehear the question of liability.

Failure to enforce the clause limiting Dresser's liability, however, presents a serious question of injustice. The parties are two substantial commercial corporate entities, experienced in the technical world of broadcasting. They had dealt with one another before and were aware of the risk that broadcast towers entail and that towers · sometimes fall. They also knew that construction costs of towers had been rising from year to year. Despite these facts, the parties entered into an agreement expressly providing that in the event of breach of warranty Dresser would, at Dresser's "sole option, repair, replace or refund an equitable portion of the purchase price of any product or work which seller determines to have been defective or failed to meet applicable specifications * * * ."

I cannot imagine any clearer agreement of the parties to limit the extent of liability. Nor can I say that the remedy fails its "essential purpose" or is "unconscionable." [1]

To suppose that the limitation on remedy contained in the contract was intended to apply only to the warranties contained in the written agreement but not to those in the catalog, is to build a fantasy on top of a fiction.[2] Under U.C.C. § 2–719(1), S.D. Compiled Laws § 57–8–49, the parties are entitled to limit remedies. To further certainty in commercial relationships and justice between these parties, we ought to enforce the contract as written.

---

1. The requirement that the buyer give notice of any defect within six months of completion stands on a different footing. If applied here it would result in the warranties and remedies failing their essential purposes and would be unconscionable.

2. The panel opinion finds the catalog representations to be part of the "bargain." However, it refuses to acknowledge that in that case they become the "specifications" for the work. They are being applied by this court. In short, the catalog representations became the "applicable specifications" referred to in the written contract. *Contra* slip op. at 642.