**COLORADO–UTE ELECTRIC ASSOCIATION, INC., Plaintiff,**

**v.**

**ENVIROTECH CORPORATION, Defendant.**

**Civ. A. No. 79–C–1655.**

United States District Court, D. Colorado.

Oct. 26, 1981.

---

Raymond J. Turner, Sherman & Howard, Denver, Colo., for plaintiff.

John J. Mullins, Jr., Wiley Y. Daniel, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

CARRIGAN, District Judge.

THIS ACTION involves the alleged breach of a sales contract for air pollution

control equipment. The plaintiff, Colorado-Ute Electric Association, Inc. (Colorado-Ute) was the buyer and the defendant, Envirotech Corporation's Buell Division (Buell) was the seller. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. This opinion constitutes my findings of fact, conclusions of law and order.

## I. BACKGROUND FACTS.

Plaintiff Colorado-Ute is a Colorado electricity generation and transmission cooperative which owns and operates a number of electrical generating units. One such unit, known as Hayden Unit 1 and located in Hayden, Colorado, is the subject of this litigation. Hayden Unit 1 is a coal burning plant built in 1965.

At the time of its construction, Hayden Unit 1 was installed with a cold-side electrostatic precipitator for pollution control. As air quality control regulations became more stringent, however, Colorado-Ute decided that it needed a more effective device than the cold-side precipitator. Consequently, in 1972, Colorado-Ute contracted with the Stearns-Rogers (Stearns) engineering and designing firm to investigate what pollution control alternatives would solve the problem of complying with state air quality control standards. It was determined that a hot-side electrostatic precipitator would best suit Colorado-Ute's needs.

A hot-side precipitator operates through static electricity. As coal is burned, residue ash particles are carried by flue gas across electrically charged wires where the particles pick up a negative charge. The flue gas then crosses positively charged collecting plates and the ash particles are attracted to these plates. Periodically, the collecting plates are vibrated, or "rapped" causing the collected ash to fall into storage hoppers.

The efficiency with which the precipitator collects the particles is a function of design. Among the factors important to the equipment's operation are the chemistry of the ash dust, the size of the particles,

flue gas composition, temperature, collecting plate area, and number of electrically charged plates utilized. Theoretically, a precipitator's efficiency increases as its size increases and gas flow decreases. Efficiency of 100% can be approached but never reached.

Having decided that a hot-side precipitator was the best alternative, Colorado-Ute, in the fall of 1972, sent various manufacturers specifications with invitations to bid. Defendant Buell submitted a proposal subject to certain exceptions and qualifications. The specifications were modified and on February 9, 1973, Colorado-Ute entered into a contract to purchase a hot-side electrostatic precipitator from Buell for a purchase price exceeding $2,600,000. The unit's total cost to Colorado-Ute, including installation, exceeded $12,000,000.

The contract required that the equipment meet performance efficiency requirements set at a level calculated to satisfy state air quality standards requiring that emissions opacity not exceed 20%. These standards could be met if the precipitator performed at 99.2% collection efficiency. To insure compliance with state regulations, however, the contract contained an overdesign requirement guaranteeing *continuous* overall efficiency of 99.6% when 15% of the precipitator's bus sections[1] were out of service. Buell warranted to bear all costs of corrective measures and field tests until continuous compliance could be achieved. In addition, Buell warranted against defective parts of workmanship for one year after the final performance test.

Installation of the precipitator was completed in December 1974, but by early 1975 it was apparent that it was not performing effectively. Buell conducted the first performance test in October; the precipitator failed to pass both the contract guaranties and the state requirements. Immediately thereafter, Buell launched additional investigations to learn what was causing the problem and assured Colorado-Ute that it would honor its commitments and warranties. Buell also retained independent consultants to study the problem.

1. Bus sections are the conductors which collect and distribute the electrical currents.

In the spring of 1976, Buell arranged a high level conference with Stearns and Colorado-Ute to discuss the precipitator's performance. Among the problems discussed were improper gas distribution, sensitivity to coal content variations, and the special problems of operating at the high elevation of Hayden. No satisfactory solution emerged from that meeting.

By September 1976, Colorado-Ute had received from the Colorado Air Pollution Control Commission official notification that it was violating air pollution standards. At that time the opacity level ranged from 25% to 40%, substantially over the state prescribed maximum of 20%.

Additional unsuccessful performance tests were conducted in January and April of 1977. Then, on August 9 and 10, 1977, tests were performed which indicated that the contract performance guaranties had been met on those two days. Unfortunately, within one month thereafter it became obvious that the opacity level was rising, and by November 3, 1977, performance fell below the contract guaranties.

At this time, November 1977, Colorado-Ute requested Stearns' opinion whether Buell had successfully passed the August 1977 tests. Stearns responded that the contract efficiency levels had been met, but declined to render an opinion whether or not the performance efficiency had been "continuous" within the meaning of the contract.

In November 1977, Colorado-Ute experimented with injecting anhydrous ammonia ($NH^3$) into the precipitator's flue gas. These injections produced an instantaneous reduction in opacity. Since that time Colorado-Ute has continued using anhydrous ammonia to maintain compliance with state standards. While Colorado-Ute did not formally seek or obtain Buell's authorization to chemically condition the flue gas with anhydrous ammonia, Buell was aware of the system by January 1978 and made no objections.

Well into 1978, Buell was still assuring Colorado-Ute that it intended to persist in its efforts to remedy the problems until the precipitator's performance was satisfactory. Then in July 1978, for the first time, Buell raised the issue of Colorado-Ute's alleged failure to provide the design temperature and flue gas volume specified in the contract. Buell presented Colorado-Ute a bill for the additional expense it claimed to have incurred because of this asserted failure.

In October 1978, Buell disclaimed any responsibility for the precipitator's performance deterioration. In December 1979, Colorado-Ute commenced this suit seeking specific performance or damages.

## II. STATUTE OF LIMITATIONS.

■ Buell asserts that this lawsuit is barred by Colorado's four year statute of limitations governing actions of this kind. § 4–2–725(1), C.R.S. 1973. Under § 4–2–725(2), C.R.S. 1973, a claim for a breach of warranty accrues when "tender of delivery is made; except, that where a warranty explicitly extends to future performance of the goods and discovery must await the time of such performance, the cause of action accrues when the breach is or should have been discovered."

Buell contends that Colorado-Ute's claim for relief accrued either upon delivery of the precipitator in 1974, or at the time the precipitator failed its first performance test in October 1975, when Colorado-Ute first learned that the unit did not meet contract performance requirements. In either case, Buell argues, Colorado-Ute's suit, filed in December 1979, is barred by the statute of limitations.

Buell's repeated reassurances and efforts to remedy the precipitator's poor performance, however, tolled the running of the statute of limitations until 1978 when Buell, for the first time, denied liability and refused to make further efforts to improve the precipitator. The doctrine that repair efforts toll the statute of limitations is recognized in a number of jurisdictions. *See e. g., Little Rock School District v. Celotex,* 574 S.W.2d 669 (Ark.1978); *Mid City Finance Co. v. Coleman,* 232 So.2d 918 (La. App.1970).

In *Kniffin v. Colorado Western Development Co.*, 622 P.2d 586 (Colo.App.1980), *cert. denied* 10 *Colo.Law.* 686 (1981), the Court held that where the obligor agrees to perform its contract obligations within a reasonable period, the statute of limitations does not begin to run until the efforts to perform are abandoned. Thus, it appears that Colorado is inclined to join the jurisdictions which have accepted the doctrine that promises and efforts to repair defects toll the statute.

Even if the repair work had not tolled the statute of limitations, Buell would be equitably estopped from taking advantage of the statute of limitations. Buell repeatedly assured Colorado-Ute that it intended to stand by its warranties. These continual verbal and written assurances were reinforced by repeated studies and efforts to correct the problems. The law will not allow one to lull an opponent to sleep on its rights and then raise the passage of time as a defense. *Strader v. Beneficial Finance Co.*, 191 Colo. 206, 551 P.2d 720, 724 (1976); *Di Salle v. Giggal*, 128 Colo. 208, 261 P.2d 499, 501 (1953). Until July 1978, Buell repeatedly reassured Colorado-Ute that Buell would honor its contract. It would be unconscionable to allow Buell to escape its contractual obligations by relying upon a defense made possible by those reassurances. *Lee v. City and County of Denver*, 29 Colo.App. 256, 482 P.2d 389, 392 (1971). The statute of limitations provides Buell no sanctuary under these circumstances. I conclude that Buell has waived this defense and, further Buell is estopped to raise it.

## III. BREACH OF WARRANTIES.

The written contract between Buell and Colorado-Ute contained a number of warranties both express and implied. Verbal and written communications outside the formal contract provided additional express warranties.

### A. *Express Warranties.*

Under § 4–2–313(1)(a), C.R.S.1973, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Express warranties are not confined only to affirmations of fact contained in the written agreement between the parties. § 4–2–313, C.R.S.1973, Official Comments 3 and 7; *Westric Battery Co. v. Standard Electric Co., Inc.*, 482 F.2d 1307, 1314 (10th Cir. 1973).

■ Section 5.08.01 of the contract warranted 99.6% overall collection efficiency with 15% of the precipitator's bus sections out of service. Section 5.08.03 further provided that the warranties would be met without pretreatment of the flue gas, in other words, without chemical conditioning. In addition to these warranties in the written contract, Buell made further express warranties in its promotional literature and in correspondence with Colorado-Ute. Buell's brochures pledged to meet the precise requirements of virtually any industrial application and represented that Buell personnel kept current with state and federal air pollution regulations. These brochures were prepared by Buell and furnished to potential purchasers, including Colorado-Ute, to induce the purchase of Buell's precipitators for the purpose, among others, of complying with air purity requirements. Therefore, these representations, too, became part of the basic bargain between buyer and seller. *Community Television Services, Inc. v. Dresser Industries, Inc.*, 586 F.2d 637 (8th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2052, 60 L.Ed.2d 660 (1979); *Fargo Machine & Tool Co. v. Kearny & Trecker Corp.*, 428 F.Supp. 364 (E.D. Mich.1977). Additionally, in letters dated December 8, 1972, and December 29, 1972, Buell further warranted that its performance guaranties would be met in *continuous* operation of the precipitator and that Buell would replace or repair all defective workmanship or materials for one year following its successful completion of the final performance test.

■ Evidence at trial demonstrated that Buell breached these express warranties. Hayden Unit 1 has been able to maintain

continuous compliance with state air pollution control standards only by injection of anhydrous ammonia into the flue gas. Although these state standards were met without chemical conditioning for two days during the August 1977 performance test, the evidence showed that performance deteriorated substantially within one month after that test. Evidence at trial indicated an expected remaining useful life of over twenty years for the precipitator. Thus, compliance for a few days, or even a month, cannot be considered "continuous" in light of the lengthy anticipated useful life.

At trial Buell argued that "continuous" compliance only required the precipitator to perform continuously during the brief period of the actual test. Colorado-Ute disputed this definition, asserting that the precipitator was required to perform continuously between scheduled plant shutdowns for routine maintenance and repairs. Since "continuous" was not defined in the contract, and no evidence was offered of its meaning in the trade, it is to be interpreted consistently with general principles of law. § 4–1–103, C.R.S.1973.

In the absence of definitions to the contrary, words in a contract are to be given their ordinary and obvious meaning. *Home Life Insurance Co. v. Stewart*, 114 F.2d 516, 517 (10th Cir. 1940). While the term "continuous" does not lend itself to precise definition, it seems obvious that a purchaser who pays millions of dollars for sophisticated equipment expected to be used for decades would anticipate that the equipment's "continuous" performance up to contract standards would last more than a month or two.

I find Buell's assertion that the term "continuous," as used in the contract, was intended to mean a two day test period to be incredible. The evidence showed that the precipitator's performance deteriorated within one month from start up. Therefore, I conclude that the performance to standards required was not "continuous" as warranted by the contract.

### B. *Implied Warranties.*

■ This contract was also subject to implied warranties of merchantability and fitness for a particular purpose. §§ 4–2–314, 315, C.R.S.1973; *Lease Finance, Inc. v. Burger*, 40 Colo.App. 107, 575 P.2d 857, 861 (1977). Neither of these warranties was affirmatively excluded. § 4–2–316, C.R.S. 1973.

The implied warranty of merchantability requires the precipitator to pass without objection in the trade under the contract description, be fit for the ordinary purpose for which it is to be used, and conform to the promises or affirmations of fact contained in the contract. § 4–2–314, C.R.S. 1973. The ordinary purpose of a precipitator is to collect pollutants and reduce the opacity level of emissions so as to comply with air quality control standards. No power company purchasing a precipitator to enable it to comply with the law would find acceptable a precipitator that is incapable of meeting state-prescribed minimum air quality levels.

Colorado-Ute's particular purpose in purchasing the hot-side precipitator was much the same as the ordinary purpose in the industry. Colorado-Ute sought compliance with Colorado air pollution regulations so as to avoid fines and shut-downs which could be imposed for violating those laws. Where the seller has reason to know of the particular purpose for which the buyer is purchasing the goods, and the buyer relies on the seller's representations that the goods can meet that purpose, there is an implied warranty that the goods will accomplish the buyer's purpose. § 4–2–315, C.R.S.1973; *Platte Valley Motor Co., Inc. v. Wagner*, 130 Colo. 365, 278 P.2d 870, 874 (1955). Buell certainly had reason to know of Colorado-Ute's need for a precipitator with continuous collection efficiency sufficient to satisfy air quality standards. Indeed, the very nature of Buell's business is to supply precipitators to industry subject to air quality regulations. Absent such regulations, there would be no market. In its promotional literature Buell indicated its awareness of federal and state laws and regula-

tions and represented that Buell would assist industry in achieving compliance.

Having known that Colorado-Ute was purchasing the precipitator to meet increasingly stringent state regulations and that Colorado-Ute was relying on its representations that it would provide such equipment, Buell impliedly warranted that the precipitator would perform at a level which would satisfy all state regulations. The precipitator's performance has not been sufficient to meet mandatory state standards. I conclude, therefore, that Buell has breached the implied warranty of fitness for a particular purpose as well as the warranty of merchantability. Buell is liable on both claims. *Comet Industries, Inc. v. Best Plastic Container Corp.*, 222 F.Supp. 723 (D.Colo.1963).

### IV. NEGLIGENCE.

Colorado-Ute asserted a claim for negligence in its complaint. At trial, however, no evidence was offered to substantiate that claim. Therefore, I conclude that Colorado-Ute failed to meet its burden of proof on its claim of negligence. That claim should be dismissed.

### V. AFFIRMATIVE DEFENSES.

#### A. *Colorado-Ute's Deviation from Design Specifications.*

■ Buell attempts to excuse its breaches of warranties by asserting that Colorado-Ute also breached the contract by failing to provide the design specifications for flue gas volume and temperature. The specifications called for a given volume and a temperature of 775° F. Colorado-Ute has been operating at approximately 75° below the specified temperature and 5%–8% over the specified volume. At trial Buell argued that if Colorado-Ute would meet these specifications then Buell would perform its part of the contract.

Despite its arguments on this matter, however, Buell offered no evidence that either the temperature variance or the volume variance was the cause of the performance problem. Nor did Buell demonstrate

that it could meet its warranties at the higher temperature and lower volume. In fact, a report prepared for Buell in 1976 concluded that one factor contributing to the substandard performance of the precipitator could be the *high* temperature. Absent evidence of causal relationship, Buell cannot excuse its own breach by relying on Colorado-Ute's relatively insubstantial deviation from the contract. *Southern Illinois Stone Co. v. Universal Corp.*, 592 F.2d 446, 453 (8th Cir. 1979).

Buell can safely suggest that it will perform its warranties under the contract if Colorado-Ute complies exactly with the original specifications because it knows that Colorado-Ute is in a "Catch 22" bind. The flue gas temperature cannot be raised without concurrently increasing the volume. Therefore, if the temperature is increased to the specified 775° F the volume will be increased even further beyond the specifications. Buell's argumentative assertions that these deviations are the cause of its breach have no basis in the evidence. I conclude that this defense is without merit.

#### B. *State of the Art Defense.*

Testimony at trial suggested that the precipitator's poor performance may be due to a phenomenon known as sodium depletion. Little was known of this phenomenon prior to 1974. Buell asserts that it cannot now be held liable for failure to consider this factor which was unknown during the manufacture of the Hayden Unit 1 precipitator. In support of this position Buell cites several tort cases holding manufacturers not liable when their products were made according to the state of the art at the time of design. Those cases are inapposite. Here Buell has expressly warranted that it possessed the technology and expertise to meet Colorado-Ute's needs.

■ By expressly warranting that it could provide Colorado-Ute with a satisfactory precipitator, Buell assumed the risk of impossibility. *United States v. Wegematic Corp.*, 360 F.2d 674, 676 (2d Cir. 1966); *Austin Co. v. United States*, 314 F.2d 518, 520 (Ct.Cl.), *cert. denied* 375 U.S. 830, 84 S.Ct.

75, 11 L.Ed.2d 62 (1963). Buell's impossibility defense is inconsistent with its express warranties and cannot be employed to avoid liability. *Gulf Oil Corp. v. Federal Power Commission,* 563 F.2d 588, 599 (3d Cir. 1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 1762 (1978); *City of Littleton v. Employers Fire Insurance Co.,* 169 Colo. 104, 453 P.2d 810, 814 (1969).

## VI. RELIEF.

■ Having concluded that Buell is liable for breach of express and implied warranties, there remains for consideration the relief to which Colorado-Ute is entitled. Specific performance is requested in the form of an order that the precipitator be made to perform as warranted. In the alternative, Colorado-Ute seeks damages for past and future costs of anhydrous ammonia and the cost of electronic control modifications necessary for implementing the ammonia injection system as a means of enhancing the precipitator's performance so that it can meet the required standards.

Specific performance is a proper remedy "where the goods are unique or in other proper circumstances." § 4–2–716(1). C.R.S.1973. The Official Comment following this section states that it seeks to "further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." *See also Eastern Airlines, Inc. v. Gulf Oil Corp.,* 415 F.Supp. 429 (S.D.Fla.1975). I conclude that the present case is a proper one for specific performance.

The precipitator is a unique item, having been specifically designed for Hayden Unit 1. It is extremely large, complex, technically intricate, and essentially irreplaceable now that it is in place. If the precipitator does not operate so as to bring Hayden Unit 1 into compliance with air quality control regulations, it is of little or no value to Colorado-Ute. A precipitator which continuously meets state standards is what was bargained for and what is needed.

Monetary damages would suffice only to the extent that they would cover the cost of bringing the precipitator's performance up to its contract warranties. Evidence at trial indicated that the use of anhydrous ammonia has accomplished this purpose, but that it is uncertain whether state regulations will continue to allow the use of chemical additives in the future. Additionally, Buell argued at trial that the award of damages for the costs of ammonia over the remaining useful life of the Hayden Unit would be speculative due to deregulation and the accompanying fluctuations in the market. Therefore, in view of the irreparable harm Colorado-Ute would suffer if the plant were shut down for air quality violations, coupled with the uniqueness of the equipment and the uncertainty as to future damages, the Court finds that specific performance is the appropriate remedy.

Buell shall bring the precipitator into compliance with the contract guaranties for the remaining estimated useful life of Hayden Unit 1. Compliance shall be accomplished in a manner Buell deems appropriate which is permitted by state and federal regulations, but shall be subject to review by this Court. For example, compliance may be accomplished by supplying Colorado-Ute with anhydrous ammonia, or other chemical conditioner, or by making appropriate mechanical or technological modifications in the precipitator.

The parties shall submit a plan and schedule to accomplish specific performance within ten days after this Order is signed.

Buell shall also compensate Colorado-Ute for its past damages incurred for the purchase of anhydrous ammonia and the installation of electronic controls. This amount shall be reduced by the stipulated set-off of $126,277 representing the retainage owed to Buell by Colorado-Ute. The parties shall have ten days to submit to the Court a stipulated proposed order for judgment setting out the amount of past damages. If such a stipulation cannot be reached, the parties shall apply to the Court for a further order.

## VI. ORDER.

In accordance with the foregoing it is

ORDERED that the Clerk of the Court shall enter judgment in favor of the plaintiff and against the defendant on the plaintiff's first, second, third, and fifth claims for relief; and for the defendant and against the plaintiff on the plaintiff's fourth claim for relief. It is further

ORDERED that judgment shall enter in favor of the plaintiff and against the defendant on the defendant's counterclaim except to the extent of the $126,277 stipulated set-off. It is further

ORDERED that the parties shall file a stipulated order for judgment regarding past damages and set-off within ten days of this Order, or apply to the Court for further order. It is further

ORDERED that the parties shall file a plan and schedule for compliance with the specific performance order within ten days of the date of this Order.